CASTEL, U.S.D.J.
SunEdison, Inc. ("SunEdison," or the "Company") was briefly one of the world's largest renewable-energy companies. As described in the Second Amended Consolidated Securities Class Action Complaint (the "Complaint"), from 2014 to 2016, SunEdison's management made a series of disastrous and short-sighted business decisions, many of which grew out of urgent liquidity needs caused by the Company's expansion. It filed for Chapter 11 bankruptcy protection in 2016,
According to plaintiffs, while SunEdison scrambled to raise financing, defendants made a series of material misstatements and omissions about the true state of affairs. In August 2015, SunEdison raised $650 million through an offering of preferred shares (the "Preferred Offering"). Plaintiffs allege that in connection with the Preferred Offering, material misstatements and omissions were made or approved by management, board members and underwriters, thereby violating sections 11 and 12(a)(2) of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77l (the "Securities Act").
Plaintiffs also allege that from August 7, 2014 through April 4, 2016 (the "relevant period"), Ahmad Chatila, who was SunEdison's Chief Executive Officer, and Brian Wuebbels, who was its Chief Financial Officer, knowingly made material misstatements and omissions about SunEdison's liquidity and financial strength, resulting in the artificial inflation of the Company's share price. They allege that Chatila and Wuebbels violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.
*457 All defendants move to dismiss plaintiffs' Securities Act claims, on the basis that the Complaint fails to allege any material misstatement or omission in the offering documents connected to the Preferred Offering. Separately, Chatila and Wuebbels move to dismiss all claims brought under section 10(b) and Rule 10b-5, and urge both that the Complaint fails to allege that they made any material misstatements and omissions and that it fails to raise a cogent and compelling inference of scienter. Finally, defendant KPMG, LLP ("KPMG") moves to dismiss the Securities Act claim brought against it in its capacity as SunEdison's external auditor.
Plaintiffs have identified dozens of statements that they believe are actionable. As will be explained, in nearly every instance, the Complaint has failed to allege that these statements omitted or misstated material information. Corporate mismanagement is not a violation of the federal securities laws. Both the Securities Act and the Exchange Act require factual allegations that show a material misstatement or omission. The Private Securities Litigation Reform Act ("PSLRA") also requires claims under section 10(b) and Rule 10b-5 to be supported by facts that raise a cogent and compelling inference of scienter.
On plaintiffs' Securities Act claims, the Court concludes that the Complaint has alleged that defendants omitted material information about the existence of an August 2015 margin call on a margin loan by the Company, and omitted the existence of a high-interest loan that the Company allegedly took to from Goldman Sachs in order to pay down that margin call. The Court also concludes that, for the purposes of the Securities Act claims, the Company's descriptions of lender recourse available on certain debts owed by SunEdison were so contradictory and confusing that they amounted to a material misstatement.
As to plaintiffs' fraud claims under section 10(b) and Rule 10b-5 of the Exchange Act, the Complaint has adequately alleged that defendant Chatila recklessly misrepresented the projected point in time at which SunEdison expected to generate cash. The Complaint otherwise fails to identify a material misstatement or omission that was made with scienter. The Complaint repeatedly fails to connect allegations of corporate mismanagement, including the purported looting of a SunEdison subsidiary, with a reckless misstatement or omission made to investors. With the exception of Chatila's projection about cash generation, the motion to dismiss plaintiffs' claims under section 10(b) and Rule 10b-5 is therefore granted.
Lastly, KPMG's motion to dismiss is granted in full. The Complaint has failed to plausibly allege that KPMG misrepresented its compliance with relevant accounting standards when it audited the Company's financial reporting and opined on its financial controls, as set forth in its Form 10-K for fiscal year 2014.
BACKGROUND
A. Overview of the Parties.
The Municipal Employees' Retirement System of Michigan ("MERS") is lead plaintiff in this action. (Compl't ¶ 1.) MERS manages the retirement and employee-benefit plans of approximately 800 municipalities in Michigan. (Compl't ¶ 18.) It holds $9.3 billion in assets. (Compl't ¶ 18.) MERS purchased SunEdison's common stock during the relevant period. (Compl't ¶ 18.) The second named plaintiff, the Arkansas Teacher Retirement System ("ATRS"), manages retirement benefits for Arkansas's public-school employees, and has $15.5 billion in total assets. (Compl't ¶ 19.) ATRS purchased shares in SunEdison's Preferred Offering. (Compl't ¶ 19.) MERS and ATRS purport to bring claims *458 on behalf of those who purchased common stock in SunEdison, sellers of publicly traded put options of SunEdison common stock, and purchasers of preferred SunEdison shares in the August 2015 Preferred Offering. (Compl't ¶ 1, 535.)
During the relevant period, defendant Ahmad Chatila was the president and CEO of SunEdison, as well as a director of the Company. (Compl't ¶ 21.) He was also chairman of the board of SunEdison's two "YieldCo" subsidiaries, Terraform Power ("TERP") and Terraform Global ("Global"). (Compl't ¶ 21.) Defendant Brian Wuebbels was Executive Vice President, Chief Administrative Officer and CFO of SunEdison. (Compl't ¶ 22.) Wuebbels also was president and CEO of both TERP and Global from November 2015 through March 30, 2016. (Compl't ¶ 22.) Plaintiffs' claims under section 10(b) and Rule 10b-5 are brought only against Chatila and Wuebbels.
Additional defendants are alleged to have violated the Securities Act. Plaintiffs bring Securities Act claims against members of SunEdison's board of directors at the time of the Preferred Offering (the "Director Defendants"),[1] the underwriters of the preferred offering (the "Underwriter Defendants"),[2] and KPMG, the Company's outside auditor. (Compl't ¶¶ 431-51.)
SunEdison itself is not a defendant in this case, and, as of the date of this Memorandum and Order, is covered by the Bankruptcy Code's automatic stay provision, 11 U.S.C. § 362. (Compl't ¶ 24.)
B. Overview of SunEdison's Business.
During the relevant period, SunEdison was one of the world's largest renewable energy companies. (Compl't ¶ 25.) It maintained two separate business segments. (Compl't ¶ 25.) The first segment, known as a "DevCo," developed new renewable energy projects. (Compl't ¶ 26.) The second segment is known as a "YieldCo." (Compl't ¶ 25.)
The YieldCos included two subsidiaries under SunEdison's control: Terraform Power ("TERP") and Terraform Global ("Global"). (Compl't ¶¶ 2, 25, 27.) SunEdison formed TERP in July 2014. (Compl't ¶ 28.) TERP's business focused on economically developed energy markets, including the United States. (Compl't ¶ 28.) SunEdison formed Global in July 2015, with the intent that its business would focus on developing markets including Brazil, India and China. (Compl't ¶ 28.)
The two YieldCos were publicly traded companies that owned completed energy facilities.[3] (Compl't ¶ 27.) As the DevCo, SunEdison developed new energy projects, which, once completed, it sold to the YieldCos.
*459 (Compl't ¶ 27.) SunEdison exercised control over TERP and Global through ownership of more than 90 percent of their voting shares and by carrying out day-to-day management, accounting and regulatory duties. (Compl't ¶ 28.)
SunEdison's separation of its DevCo business and its two YieldCo spinoffs was explained as a measure that would bring favorable returns to investors. (Compl't ¶ 30.) The Company's DevCo business expected to generate a steady cash flow from the sale of its completed projects to the YieldCos. (Compl't ¶ 30.) As public companies, the YieldCos would purchase the DevCo's developments using money raised in stock offerings. (Compl't ¶ 30.) SunEdison also believed that because the YieldCos functioned as captive buyers for its projects, it could reduce financing costs and "get superior value for those projects." (Compl't ¶ 30.) In addition, as a major shareholder of the YieldCos, SunEdison would profit from any dividends that they issued. (Compl't ¶ 30.)
C. Overview of SunEdison's Expansion and Collapse.
Plaintiffs allege that after SunEdison adopted its two-tiered, DevCo and YieldCo business model, management undertook a series of disastrous measures that ultimately drove the Company to bankruptcy. The Court will discuss in detail the defendants' allegedly material misstatements and omissions below, but an overview of SunEdison's decline is useful context for plaintiffs' theories of liability.
From 2013 to 2015, SunEdison pursued an aggressive growth strategy, during which its debt ballooned from $2.6 billion to $10.7 billion. (Compl't ¶ 32.) The Company went on an acquisition spree. In the summer of 2015, SunEdison announced eleven major transactions, a partial list of which includes the purchase of companies such as Latin America Power Holding, B.V. ("Latin American Power") and Continuum Wind Energy Limited; acquisition of wind-power plants in Idaho and Oklahoma; acquisition of a solar-panel installer in the United Kingdom; and construction of a wind-power project in Maine. (Compl't ¶¶ 42-43.) Not all of these acquisitions were consummated, including the planned acquisition of Latin American Power.
SunEdison required significant financing to complete these transactions. As will be discussed, plaintiffs allege that SunEdison's expansion strategy left it with a constant need to obtain additional financing on favorable terms. When the Company did not have ready access to cash, payment to key vendors was delayed or never made. The Complaint alleges that the Company made material omissions or misstatements about the terms of outside funding that it obtained in 2015, including the existence of a margin call on a previously disclosed margin loan, the terms of a high-interest loan from Goldman Sachs, and certain creditors' ability to take recourse against SunEdison itself.
The Complaint highlights two loans obtained by SunEdison. On January 29, 2015, SunEdison took out a $410 million margin loan (the "Margin Loan") in order to finance the purchase of First Wind LLC, a company it was jointly acquiring with TERP.[4] (Compl't ¶ 33.) Under the Margin Loan agreement, SunEdison agreed to the prepayment or the posting of additional collateral in the event that the common stock of TERP fell below a set price. (Compl't ¶ 34.) On or about August 7, 2015, TERP's share price fell below that threshold, thus triggering a margin call that allegedly *460 sent the Company scrambling for cash. (Compl't ¶ 332.) Although the Margin Loan had been disclosed to investors, the Company did not publicly acknowledge the margin call until August 25, 2015, one week after the Preferred Offering.
The Complaint also describes a high-interest, second-lien loan (the "Second-Lien Loan") that SunEdison took from Goldman Sachs in August 2015. (Compl't ¶ 102.) Under this "secretly negotiated" loan, SunEdison borrowed $169 million at 9.25% interest, plus an origination fee of $9 million. (Compl't ¶ 102.) Plaintiffs state that "this enormously high rate" and the fact that the loan carried a second lien reflected that SunEdison was a "cash-strapped" company whose assets had already been pledged to other, first-lien loans. (Compl't ¶ 102.) According to the Complaint, the Second-Lien Loan was taken in order to make payments on the margin call. (Compl't ¶ 118.) Like the margin call, the existence and terms of the Second-Lien Loan were not disclosed in the offering documents.
On August 17, 2015, SunEdison announced the Preferred Offering of 650,000 convertible preferred securities priced at $1,000 per share. (Compl't ¶ 120.) On that same date, SunEdison filed an offering prospectus and a shelf registration statement. (Compl't ¶ 120.) The Preferred Offering was underwritten by the Underwriter Defendants, and was "for general corporate purposes." (Compl't ¶ 120.) Plaintiffs' Securities Act claims are based entirely on the offering documents and the documents that they incorporated by reference. According to the Complaint, when SunEdison's financial conditions were fully revealed, the value of these preferred shares dropped from $1,000 per share to $23 per share. (Compl't ¶ 7.)
As depicted in the Complaint, some of SunEdison's liquidity problems arose because the Company was plagued by ineffective internal financial controls, which defendants Chatila and Wuebbels certified as effective under the Sarbanes-Oxley Act. Plaintiffs allege that the Company never integrated the accounting systems of its corporate acquisitions, and that, with no unified accounting system, its employees used a "piecemeal" approach that "made it impossible" to know what SunEdison owed its creditors. (Compl't ¶¶ 70-73.) The Company attempted to consolidate all financial data into a single Excel spreadsheet, which one manager called "literally the most complicated spreadsheet" he had ever seen. (Compl't ¶ 76.) Plaintiffs assert that Excel spreadsheets are not acceptable accounting platforms because they lack input controls, so that one error can generate a domino effect of inaccuracies. (Compl't ¶¶ 76-78.)
The Complaint identifies subsequent disclosures that the Company made from August 2015 through April 2016 and the correlated drops in share price, which, plaintiffs allege, reflected the market's reaction to learning the truth about SunEdison's dwindling liquidity. (Compl't ¶¶ 123-253.) Among other things, the Complaint also alleges that SunEdison's cash-strapped DevCo business coerced Global into purchasing a project for $231 million, and did so after firing dissenters in Global's management and installing new board members. (Compl't ¶¶ 181-214.) In March 2016, the Company announced that it was delaying the filing of its annual 10-K, and acknowledged weaknesses in the Company's internal controls. (Compl't ¶¶ 237-44.) On March 28, 2016, the press reported that the SEC had commenced an investigation of SunEdison. (Compl't ¶ 245-47.)
On April 21, 2016, SunEdison and 25 affiliated entities filed petitions for bankruptcy protection in the Bankruptcy Court of this District. (Compl't ¶ 254.) SunEdison *461 claimed more than $16 billion in debt, inclusive of debts held by TERP and Global. (Compl't ¶ 254.)
MOTION TO DISMISS STANDARD.
A. Rule 12(b)(6) Standard.
To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ). Legal conclusions are not entitled to the presumption of truth, and a court assessing the sufficiency of a complaint disregards them. Iqbal, 556 U.S. at 678, 129 S.Ct. 1937. Instead, the Court must examine only the well-pleaded factual allegations, if any, "and then determine whether they plausibly give rise to an entitlement to relief." Id. at 679, 129 S.Ct. 1937. The Complaint must include non-conclusory factual allegations that " 'nudge[ ]' " its claims " 'across the line from conceivable to plausible.' " Id. at 680, 129 S.Ct. 1937 (quoting Twombly, 550 U.S. at 570, 127 S.Ct. 1955 ).
In addition to considering the Complaint's allegations, a court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).
When claims brought under sections 11 and 12(a)(2) of the Securities Act are premised on fraudulent conduct, courts will apply the heightened scrutiny of Rule 9(b), Fed. R. Civ. P., to those claims. See, e.g., Rombach v. Chang, 355 F.3d 164, 170-71 (2d Cir. 2004). Although plaintiffs' claims under sections 11 and 12(a)(2) of the Securities Act overlap with their section 10(b) and Rule 10b-5 claims under the Exchange Act, defendants do not urge that Rule 9(b) applies to the Securities Act claims. The Court therefore reviews plaintiffs' Securities Act claims pursuant to Rule 8(a), Fed. R. Civ. P., and not the heightened particularity standard of Rule 9(b). See generally Hutchison, 647 F.3d 479, 484 (2d Cir. 2011) (reviewing Securities Act claims under notice-pleading standard when plaintiffs disclaim fraud and defendants "do not contend otherwise.").
B. The Heightened Pleading Required by Rule 9(b) and the PSLRA.
A plaintiff bringing claims under section 10(b) and Rule 10b-5 must "satisfy the heightened pleading requirements of the [PSLRA] and Rule 9(b) of the Federal Rules of Civil Procedure." Indiana Pub. Ret. Sys. v. SAIC, Inc., 818 F.3d 85, 92 (2d Cir. 2016), cert. granted sub nom. Leidos, Inc. v. Indiana Pub. Ret. Sys., --- U.S. ----, 137 S.Ct. 1395, 197 L.Ed.2d 553 (2017).
"[T]he PSLRA specifically requires a complaint to demonstrate that the defendant made '[m]isleading statements and omissions ... of a material fact,' 15 U.S.C. § 78u-4(b)(1), and acted with the '[r]equired state of mind' (the 'scienter requirement'), id. § 78u-4(b)(2)." Emp. Ret. Sys. of Gov't of the Virgin Islands v. Blanford, 794 F.3d 297, 305 (2d Cir. 2015). "The plaintiff may satisfy this requirement by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." ATSI, 493 F.3d at 99. " '[I]n determining whether the pleaded facts give rise to a 'strong' inference of *462 scienter, the court must take into account plausible opposing inferences.' " Id. (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 336, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) ). A complaint "therefore must allege with particularity facts that give rise to 'a strong inference' that [defendants] acted consciously and recklessly in omitting or misrepresenting financial information." Indiana Pub. Ret. Sys., 818 F.3d at 93.
Similarly, Rule 9(b) states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." "To satisfy the pleading standard for a misleading statement or omission under Rule 9(b), a complaint must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.' " Emp. Ret. Sys. of Gov't of the Virgin Islands, 794 F.3d at 305 (quoting Rombach, 355 F.3d at 170 ). "This pleading constraint serves to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits." ATSI, 493 F.3d at 99.
DISCUSSION.
I. DEFENDANTS' MOTION TO DISMISS THE SECURITIES ACT CLAIMS ARE GRANTED IN PART AND DENIED IN PART.
A. Overview of the Securities Act.
Counts Three through Five allege that all defendants violated provisions of the Securities Act. The Securities Act claims relate in their entirety to the Preferred Offering of August 2015, in which SunEdison announced the sale of $650 million in preferred shares. These claims are directed to statements and omissions made in the registration statement, the prospectus supplement, and SunEdison's earlier SEC filings incorporated by reference therein (the "Offering Documents").
Plaintiffs allege that defendants violated the Securities Act by making material misstatements and omissions related to SunEdison's liquidity and available cash, omitting information concerning the margin call of August 2015, omitting the Second-Lien Loan, misrepresenting the availability of creditor recourse against SunEdison's debt, misstating the adequacy of internal controls in a certification by Chatila and Wuebbels and by omitting a description of Company liquidity trends required by Item 303 of the SEC rules. (Compl't ¶¶ 452-78.) Plaintiffs allege that the Underwriter Defendants failed to perform adequate due diligence on statements contained in the offering documents. (Compl't ¶¶ 480-82.)
Plaintiffs allege that all defendants violated section 11 of the Securities Act. (Compl't ¶ 504-08.) "Section 11 of the Securities Act prohibits materially misleading statements or omissions in registration statements filed with the SEC." In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 358 (2d Cir. 2010) (citing 15 U.S.C. § 77k(a) ). "To state a claim under section 11, the plaintiff must allege that: (1) she purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement 'contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.' " Id. at 358-59 *463 (quoting 15 U.S.C. § 77k(a) ). Section 11 " 'imposes strict liability on issuers and signatories, and negligence liability on underwriters,' for material misstatements or omissions in a registration statement." Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc., 873 F.3d 85, 99 (2d Cir. 2017) (quoting NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co., 693 F.3d 145, 156 (2d Cir. 2012) ). For a statement of opinion to be actionable under section 11, a plaintiff must plausibly allege that the opinion was not honestly held by the speaker at the time that the statement was made. See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, --- U.S. ----, 135 S.Ct. 1318, 1326-27, 191 L.Ed.2d 253 (2015).
Plaintiffs also allege that the Underwriter Defendants violated section 12(a)(2) of the Securities Act. (Compl't ¶¶ 519-527.) "Section 12(a)(2) provides similar redress where the securities at issue were sold using prospectuses or oral communications that contain material misstatements or omissions." In re Morgan Stanley, 592 F.3d at 359 (citing 15 U.S.C. § 77l (a)(2).) Section 12(a)(2) claims may be brought against a "statutory seller," which includes those who successfully solicited the purchase of the security in service of their own financial interests. Id."[T]he elements of a prima facie claim under section 12(a)(2) are: (1) the defendant is a 'statutory seller'; (2) the sale was effectuated 'by means of a prospectus or oral communication'; and (3) the prospectus or oral communication 'include[d] an untrue statement of a material fact or omit[ted] to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.' " Id. (quoting 15 U.S.C. § 77l (a)(2) ).
The Second Circuit has characterized sections 11(a) and 12(a)(2) as "Securities Act siblings with roughly parallel elements ...." Id. Section 11 imposes " 'virtually absolute' liability" as to issuers, while other defendants under sections 11 and 12(a)(2) "may be held liable for mere negligence." Id."Moreover, unlike securities fraud claims pursuant to section 10(b) of the [Exchange Act], plaintiffs bringing claims under sections 11 and 12(a)(2) need not allege scienter, reliance, or loss causation." Id.
Finally, plaintiffs allege that Chatila, Wuebbels and the Director Defendants are liable as control persons under section 15 of the Securities Act, 15 U.S.C. § 77o . (Compl't ¶¶ 528-33.) Section 15 establishes joint and several liability for any control person, and requires a plaintiff to prove both a primary violation and control by defendants over a primary violator. FHFA, 873 F.3d at 99.
B. The Complaint Has Plausibly Alleged Material Omissions and Misstatements Concerning Aspects of the Company's Borrowing Arrangements, but Defendants' Motion to Dismiss Is Otherwise Granted.
1. Plaintiffs' Securities Act Claims Directed to the Strength of the Company's Liquidity Are Dismissed.
According to the Complaint, defendants materially misrepresented the strength and prospects of SunEdison's liquidity in its 10-K for 2014, as well as in its 10-Qs for the first and second quarters of 2015. (Compl't ¶¶ 453-55.) These filings were incorporated into the Offering Documents by reference.
Each of the three filings contains the following passage, which plaintiffs claim was materially false and misleading:
*464 We believe our liquidity will be sufficient to support our operations for the next twelve months, although no assurances can be made if significant adverse events occur, or if we are unable to access project capital needed to execute our business plan.
(Compl't ¶¶ 453-55.) The three filings also stated that "[w]e expect cash on hand, 2015 operating cash flows, project finance debt, the Solar Energy credit facility, the Terraform term loan and project construction facility to provide sufficient capital to support the acquisition and construction phases of our currently planned projects for 2015 and otherwise meet our capital needs for the remainder of 2015."[5] (Compl't ¶¶ 453-55.)
According to the Complaint, these statements were materially false and misleading because, at the time that they were made, "the Company was already suffering from a liquidity crisis." (Compl't ¶ 456.) The Complaint alleges that in 2014 and 2015, SunEdison was not paying essential vendors, and that its cash shortfalls had become the subject of weekly calls among the Company's senior management. (Compl't ¶¶ 456-58.)
For claims under both the Exchange Act and the Securities Act, the PSLRA creates a "safe harbor" for forward-looking statements. 15 U.S.C. § 77z-2(c) (Securities Act); Id. § 78u-5(c) (Exchange Act). For the Securities Act, the PSLRA provides that in a private action, a person "shall not be liable" for claims based on "an untrue statement" or "material omission" if the forward-looking statement is identified as forward-looking, and "is accompanied by meaningful cautionary statements identifying important factors that could cause the actual results to differ materially from those in the forward-looking statement ...." Id. § 77z-2(c)(1)(A)(i). There is no duty to update a forward-looking statement. Id. § 77z-2(d).
The provision governing for the Exchange Act similarly states: "On any motion to dismiss based upon subsection (c)(1), the court shall consider any statement cited in the complaint and any cautionary statement accompanying the forward-looking statement, which are not subject to material dispute, cited by the defendant." Id. § 78u-5(e).
To qualify as a forward-looking statement, language need not "be contained in a separate section or specifically labeled" as "forward-looking." Slayton v. Am. Exp. Co., 604 F.3d 758, 769 (2d Cir. 2010). "[T]he facts and circumstances of the language used in a particular report will determine whether a statement is adequately identified as forward-looking." Id. It is a "common-sense proposition" that a statement that "projects results in the future" and uses "words such as 'expect' " are forward-looking. Id.
Similarly, courts have adopted a "bespeaks caution" doctrine, pursuant to which " 'alleged misrepresentations in a stock offering are immaterial as a matter of law [if] it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering.' " Rombach, 355 F.3d at 173 (quoting Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 357 (2d Cir. 2002) ).
It is also relevant that the plaintiffs point to statements made in the Management's Discussion and Analysis ("MD & A") sections of the filings. "[T]he purpose of the MD & A is to present the company's business 'as seen through the eyes of those *465 who manage [it].' " Slayton, 604 F.3d at 767 (quoting Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations, 68 Fed. Reg. 75,056, 75,056 (Dec. 29, 2003) ). "Congress explicitly included 'a statement of future economic performance ... contained in a discussion and analysis of financial condition by the management' in its definition of a forward-looking statement, 15 U.S.C. § 78u-5(i)(1)(C)...." Slayton, 604 F.3d at 767.
According to defendants, the statements concerning Company liquidity were forward-looking and accompanied by meaningful cautionary language about the Company's need to continue raising funds, as well as the warning that such funding may not be available. The Form 10-K for 2014 and the two Form 10-Qs for the first quarter of 2015 each stated:
In addition to our need to maintain sufficient liquidity from cash flow from our operations and borrowing capacity under our credit facilities, we will need to raise additional funds in the future in order to meet the operating and capital needs of our renewable energy system development business..... However, there can be no assurances that such project financing or equity will be available to us, or available on terms and conditions we find acceptable. We may not be able to sell renewable energy projects or secure adequate debt financing for such projects on favorable terms, or at all, at the time when we need such funding.
In the event that we are unable to raise additional funds, our liquidity will be adversely impacted, we may not be able to maintain compliance with our existing debt covenants and our business will suffer. If we are able to secure additional financing, these funds could be costly to secure and maintain and could significantly impact our earnings and liquidity.
(See, e.g., Bartlett Dec. Ex. 2 at 16; Ex. 9 at 50; Ex. 10 at 61.)
The 10-K for 2014 contained additional, similar language. It stated that if the Company could not fund its debt service obligations, it "could face substantial liquidity problems and could be forced to reduce or delay investments and capital expenditures or to sell assets or operations, seek additional capital or restructure or refinance our indebtedness." (Bartlett Dec. Ex. 2 at 33.) It stated that an inability to generate sufficient cash flows "would materially and adversely affect our financial position and results of operations and our ability to satisfy our debt obligations." (Id. ) In bolded and italicized language, the 10-K cautioned that SunEdison "may not be able to generate sufficient cash to service all of our indebtedness and may be forced to take other actions to satisfy our obligations under our indebtedness, which may not be successful. " (Bartlett Dec. Ex. 2 at 33; emphasis in original.) It stated, "If our cash flows and capital resources are insufficient to fund our debt service obligations, we could face substantial liquidity problems and could be forced to reduce or delay investments and capital expenditures or to sell assets or operations, seek additional capital or restructure or refinance our indebtedness." (Bartlett Dec. Ex. 2 at 33.)
The 10-K and two 10-Qs stated that "[w]e believe" liquidity "will be sufficient ... for the next twelve months," while cautioning in the same sentence that this could change based on adverse events or an inability to "access project capital ...." (Compl't ¶¶ 453-55.) This statement of belief about liquidity over the course of a year, qualified by an acknowledgment of the risk of adverse events, is identified as a forward-looking statement with a *466 cautionary statement identifying risk factors that could alter expected results. See 15 U.S.C. § 77z-2(c)(1)(A)(i). The Court concludes that these descriptions of the Company's liquidity positions are non-actionable under the PSLRA's safe-harbor provisions.
Likewise, the statement that "[w]e expect cash on hand" and other funding sources to "meet our capital needs for the remainder of 2015" is a qualified and forward-looking statement. A statement about what the speaker "expect[s]" is forward-looking. See, e.g., Slayton, 604 F.3d at 769.
The Court further concludes that the three SEC filings include meaningful cautionary language about the Company's need for additional liquidity. This language expressly alerts investors that SunEdison will "need to raise additional funds in the future" in order to meet operating needs. (Bartlett Dec. Ex. 10 at 61.) It makes "no assurances" that financing will be available on "acceptable" terms, and warns that new financing might not be available at all. (Id. ) In a bolded and italicized passage quoted above, the Company warned that it may not be able to generate cash sufficient to service its debt, and may not succeed in other alternative debt-servicing measures. (Bartlett Dec. Ex. 2 at 33.) It warned of "substantial liquidity problems" if it could not service its debt. (Bartlett Dec. Ex. 2 at 33.)
These warnings to the investing public were "meaningful cautionary statements" that "identif[ied] important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i). These warnings were "not boilerplate" and adequately "conveyed substantive information." Slayton, 604 F.3d at 772.
Because plaintiffs' claims are directed to forward-looking statements accompanied by meaningful cautionary language, the statements about liquidity contained in the 2014 Form 10-K and the Form 10-Qs for the first two quarters of 2015 are non-actionable. Plaintiffs' claims under both the Exchange Act and the Securities Act directed to statements by the Company concerning its ongoing liquidity are therefore dismissed.
2. The Complaint Does Not Plausibly Allege a Violation of SEC Item 303.
For similar reasons, defendants' motion is granted to the extent that plaintiffs claim that defendants failed to adequately disclose or explain liquidity trends likely to affect the Company.
Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303 requires disclosure of trends and uncertainties that may affect a company. To plausibly allege a violation of Item 303, a plaintiff must identify a trend that "was already known and existing," and allege that "the trend or uncertainty ... was reasonably likely to have a material impact" on the registrant's financial condition. Litwin v. Blackstone Grp., L.P., 634 F.3d 706, 716 (2d Cir. 2011). Item 303 specifically requires registrants to "[i]dentify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way." 17 C.F.R. § 229.303(a)(1). Item 303 defines "liquidity" as "the ability of an enterprise to generate adequate amounts of cash to meet the enterprise's needs for cash." Id. at Instr. 5.
"[F]ailing to comply with Item 303 by omitting known trends or uncertainties from a registration statement or prospectus is actionable under Sections 11 and 12(a)(2) of the Securities Act of 1933."
*467 Stratte-McClure v. Morgan Stanley, 776 F.3d 94, 101 (2d Cir. 2015). "Item 303's disclosure obligations, like materiality under the federal securities laws' anti-fraud provisions, do not turn on restrictive mechanical or quantitative inquiries." Panther Partners Inc. v. Ikanos Commc'ns, Inc., 681 F.3d 114, 122 (2d Cir. 2012). The Second Circuit has identified actionable Item 303 violations when a company is silent about the known threats posed by a trend or uncertainty. See Litwin, 634 F.3d at 718-19 (actionable failure to disclose how national deterioration of the real-estate market could affect registrant's vast real-estate portfolio); Panther Partners, 681 F.3d at 121-22 (actionable failure to disclose known "defect issue" in computer chips that jeopardized the registrant's "relationship with clients who at the time accounted for the vast majority of its revenues."); Indiana Pub. Ret. Sys., 818 F.3d at 95-96 (actionable failure to disclose acts of employee fraud that jeopardized existing and future contracts).
Plaintiffs allege that defendants violated Item 303 by failing to disclose known trends about SunEdison's liquidity. They allege that SunEdison's liquidity problems were known to defendants. According to the Complaint, Wuebbels participated in weekly "cash calls," where SunEdison management reviewed the status of projects and the cash needed for vendor payments. (Compl't ¶ 65.) Wuebbels allegedly approved all cash distributions to vendors. (Compl't ¶ 65.) The Complaint also describes a January 2015 call led by Chatila, in which a SunEdison employee said that the Company was about to lose telephone service because SunEdison had not paid its bills, and that suppliers were "breathing down their necks" about payments. (Compl't ¶ 65.) Chatila allegedly replied with a "rant" about making sacrifices to rapidly grow the Company. (Compl't ¶ 65.) The Complaint notes that the Company's vendors and creditors ultimately stopped doing business with SunEdison because of its cash shortfalls. (Compl't ¶ 273.)
However, in light of SunEdison's disclosures, the Court concludes that the Company's filings adequately identified and explained the known trends and uncertainties as to its liquidity and need for outside financing. A reasonable investor reviewing filings incorporated into the Offering Documents would have understood that, going forward, SunEdison required a steady infusion of financing from external sources, but that the availability of funding was uncertain. A reasonable investor would have understood that the Company would face dire consequences if outside funding became unavailable. Such an investor would have been informed of the following trends and uncertainties concerning the Company's liquidity situation:
• That SunEdison "continue[d] to incur significant indebtedness to fund our operations and acquisitions and [had] significant pending obligations ...." (Bartlett Dec. Ex. 12 at 69.)
• That "no assurances can be made that we will not require additional sources of liquidity to execute our business plan." (Id. )
• That the Company's "ability to meet our debt service obligations and other capital requirements ... will depend on various factors, including our future operating performance which, in turn, will be subject to general economic, financial, business, competitive, legislative, regulatory and other conditions, many of which are beyond our control." (Id. )
• That "[w]e expect to continue to incur losses, and we expect our operations, including our acquisition activities, to continue to require *468 substantial cash expenditures, cash commitments and third party financing." (Id. )
• That the Company had "a significant amount of indebtedness " that "require[d] significant cash flow from operations and funds from various financing sources that may not be available in the future and as a result our business could be adversely affected, including our ability to develop new projects and fund our regular operational needs. " (Id. at 85; emphasis in original.)
• That "[i]f we are unable to secure additional financing, our earnings, liquidity and ability to develop projects will be adversely impacted and we may not be able to maintain compliance with our existing debt covenants and our business will suffer." (Id. )
These statements identified the trends and uncertainties that plaintiffs claim were omitted. They informed investors that the Company's "significant indebtedness" was "expect[ed] to continue," requiring "significant cash flow" and outside financing, the availability of which was uncertain. The Company disclosed that if financing was unavailable, the Company would face serious adverse consequences.
Because SunEdison identified known trends and uncertainties related to the Company's liquidity needs, plaintiffs have failed to allege an actionable violation of Item 303. See, e.g., Stadnick v. Vivint Solar, Inc., 861 F.3d 31, 39 (2d Cir. 2017) (plaintiffs did not plausibly allege Item 303 violation when the "registration statement included ample warning that its business could be affected by evolving regulatory regimes ....").
Defendants' motion to dismiss is therefore granted as to plaintiffs' claims directed to Item 303.
3. The Complaint Does Not Plausibly Allege that Sarbanes-Oxley Certifications about the Company's Internal Controls Were Materially Misleading.
Plaintiffs allege that Chatila and Wuebbels violated section 11 of the Securities Act by submitting false certifications under the Sarbanes-Oxley Act as to the adequacy of the Company's internal controls. In the Company's Form 10-K for 2014 and its Form 10-Qs for the first two quarters of 2015, Chatila and Wuebbels certified that they had personal knowledge of the Company's internal controls for financial reporting, that they were responsible for the design and maintenance of its internal controls, and that those internal controls were effective. (Compl't ¶¶ 321-23.) The Offering Documents incorporated these filings by reference.
The Court concludes that the Complaint has set forth allegations that describe an inefficient process for consolidating the Company's financial data, and one that was vulnerable to error. But these allegations also fail to identify any inaccurate financial data that was reported as a result. Of the three SEC filings that allegedly contained false certifications of effective internal controls, none are alleged to have included inaccurate financial reporting. With no inaccuracies or other tangible harms identified, plaintiffs have not plausibly alleged that the certifications were false. See In re Braskem S.A. Sec. Litig., 246 F.Supp.3d 731, 758 (S.D.N.Y. 2017) (dismissing claim directed to internal controls over financial reporting when complaint "does not concretely allege that any of [the company's] financial reports were in any way inaccurate.") (Engelmayer, J.).
The Sarbanes-Oxley Act of 2002 requires that for each 10-Q and 10-K filing, *469 company officers must certify that they have reviewed the filing, and must verify its completeness and accuracy. 15 U.S.C. § 7241(a)(1)-(3). It provides that the signing officers are responsible for implementing and maintaining internal controls, and requires them to set forth their conclusions about the effectiveness of the company's internal controls. Id. § 7241(a)(4). These requirements are implemented by SEC rules. See 17 C.F.R. § 229.308 ; 17 C.F.R. § 240.13a-14.
Judge Sweet has described "[m]anagement's assessment of internal control over financial reporting" as "a critical metric for investors because it provided assurance that the Company's financial statements were reliable and in compliance with applicable laws." In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig., 763 F.Supp.2d 423, 471 (S.D.N.Y. 2011). When a company misrepresents the effectiveness of its internal controls, investors may be left with a false impression of the company's risks and holdings. Id. at 470-71. To be actionable, a defendant's certification about the adequacy of internal controls must have been knowingly false at the time that it was made. See, e.g., In re Eletrobras Sec. Litig., 245 F.Supp.3d 450, 468-69 (S.D.N.Y. 2017) (statements claiming strong internal controls were actionable when defendants were aware of "red flags" that "highlighted significant problems") (Koeltl, J.); In re Sanofi Sec. Litig., 155 F.Supp.3d 386, 402 (S.D.N.Y. 2016) (certifications were not actionable when "plaintiffs fail to allege any facts pertaining to [Sanofi's] internal structure for financial reporting, much less that [Sanofi] lacked adequate internal controls.") (collecting cases). Misrepresentations of the quality of internal controls and inaccurate accounts of management's attempts to improve them can be actionable. See, e.g., Varghese v. China Shenghuo Pharm. Holdings, Inc., 672 F.Supp.2d 596, 606 (S.D.N.Y. 2009) (Marrero, J.); Hall v. The Children's Place Retail Stores, Inc., 580 F.Supp.2d 212, 233-34 (Scheindlin, J.). The use of non-secure spreadsheets that are vulnerable to human error may be evidence of ineffective internal controls. See In re MF Global Holdings Ltd. Sec. Litig., 982 F.Supp.2d 277, 298 (S.D.N.Y. 2013) (Marrero, J.).
In each certification, Chatila and Wuebbels stated that "[b]ased on my knowledge," the filings fairly reflected the Company's finances, including cash flows. (Compl't ¶ 471.) The certifications stated that Chatila and Wuebbels were "responsible for establishing and maintaining disclosure controls and procedures," and that they personally "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes ...." (Compl't ¶ 471.)
The Complaint includes detailed allegations that describe the alleged infirmities in the Company's internal controls. They include two principal weaknesses: first, the Company failed to integrate the different accounting systems of acquired companies, resulting in a piecemeal, chaotic approach to tracking the Company's finances; second, the Company attempted to consolidate its financial data into an unsecured Excel spreadsheet that contained no input controls and was vulnerable to inaccuracies.
The Complaint describes complications caused by the Company's use of different accounting platforms across different business divisions. The former Head of Global Field Operations at SunEdison has stated that, going back to 2013, the Company failed to integrate acquired entities and *470 internal divisions into a single system for monitoring financial data, resulting in a "poorly built system," a "clunky and broken process" and a "massive disconnect." (Compl't ¶ 70.) The Complaint quotes a senior auditor of SunEdison as stating that the Company used "a cluster of different accounting systems that made it a nightmare for any sort of internal controls to be functional." (Compl't ¶ 72.)
The Complaint also includes detailed descriptions posed by the consolidation of financial data into a single, unsecured Excel spreadsheet. The Complaint alleges that the Company manually consolidated financial data into a single Excel spreadsheet, a practice that began in or around 2009. (Compl't ¶ 76.) The former Head of Global Field Operations called the document "literally the most complicated spreadsheet" he had ever seen, and said that it was internally referred to as the "Brain Damage" spreadsheet." (Compl't ¶ 76.) A senior auditor has stated that use of the Excel document was "a huge problem because Excel has very little security around it" and the document lacked "any sort of IT controls." (Compl't ¶ 78.) There were no input controls to ensure that data was correctly entered by code and category, or to flag likely errors. (Compl't ¶ 78.) According to the Complaint, this meant that incorrect entries could go unnoticed, leading to cascading errors and miscalculations. (Compl't ¶ 78.) Moreover, there were no access controls to the Excel spreadsheet, meaning that any employee "with even minimal security clearance" could alter it. (Compl't ¶ 79.) The Complaint cites to the senior auditor's view that standard accounting software typically tracks who entered data, and that typically material inputs cannot be made without the authorization of a controller. (Compl't ¶ 79.) The Global Head of Field Operations, who left the Company in 2015, is quoted in the Complaint as stating that the document's security was so weak that even after his departure, he could still access the spreadsheet to change entries and review information. (Compl't ¶ 79.)
Viewed together, these allegations describe a confused, inefficient and unsecured process for tracking the Company's financial data. However, the Complaint fails to identify any erroneous financial reporting that resulted. The absence of any actual deficiencies in the Company's financial reporting, or any other tangible harm resulting from the Company's controls, renders implausible plaintiffs' claim that the certifications were false. Similarly, plaintiffs have described vulnerabilities in the Company's use of an unsecured spreadsheet, but they have not identified any instances in which the spreadsheet was improperly accessed or manipulated by an employee, or where use of the spreadsheet resulted in false reporting. In short, the Complaint has included extensive details about the alleged problems with the Company's internal controls, but it has not identified a resulting error.
With no corresponding error in the Company's financial reporting, the Complaint fails to plausibly allege that the certification of effective internal controls was false or misleading. Claims that successfully allege insufficient internal controls typically involve instances where the failure of internal controls led to restated financial results or were accompanied by misconduct. In Dobina v. Weatherford International, Ltd., 909 F.Supp.2d 228, 244-48 (S.D.N.Y. 2012), Judge Kaplan concluded that plaintiffs had alleged with particularity an Exchange Act claim that defendants falsely certified the effectiveness of the Company's internal controls. There, the company at issue had to restate its financial results and acknowledged incorrect historical disclosures as to tax liabilities. Id. at 245. Similarly, in *471 In re Bear Stearns, Judge Sweet concluded that plaintiff adequately alleged a misrepresentation of the effectiveness of internal controls where the company had failed to comply with GAAP in its financial reporting, and left a misimpression that the company was more profitable, better capitalized and had better liquidity access than was actually the case. 763 F.Supp.2d at 484 ; see also In re Braskem, 246 F.Supp.3d at 758 (dismissing claim directed to internal controls over financial reporting when complaint "does not concretely allege that any of [the company's] financial reports were in any way inaccurate."); In re Eletrobras, 245 F.Supp.3d at 468 (statements asserting strong internal controls against fraud were actionable when the company was "ultimately subject to write-offs due to illicit payments ...."); Varghese, 672 F.Supp.2d at 606 (Sarbanes-Oxley certification of effective internal controls was actionable when company allegedly misreported financial data, including false or misleading statements about "net loss, losses per share, and general and administrative expenses ...."); Hall, 580 F.Supp.2d at 232 (complaint alleged false Sarbanes-Oxley certifications with particularity when defendants allegedly knew of stock-option backdating practices and the company misreported compensation expenses).
The Complaint alleges that the Company later acknowledged weaknesses in its internal controls in April 2016, and that these statements show that the Sarbanes-Oxley certifications were knowingly false at the time they were made. But the weaknesses identified in 2016 did not touch on financial reporting. Instead, the Company identified weaknesses in its cash forecasting processes, management's need to more fully discuss risks and adjustments with the Company's board, management's inadequate response to missed cash forecasts, and management's disclosures to the Company board concerning cash flow, including extensions of accounts payable and use of cash committed for projects. (Compl't ¶ 498.) These statements about deficient internal controls related to internal management of cash and management's disclosures to the board, and not to public financial reporting.
The Complaint has alleged facts showing that the Company's methods for consolidating financial data were inefficient, and perhaps even vulnerable to error. However, the plaintiffs have failed to identify any resulting inaccuracies or misstatements of financial reporting. Without any error in financial reporting or other misstatement attributable to the Company's internal controls, the Complaint cannot plausibly allege that the internal controls were, in fact, ineffective.
The defendants' motion to dismiss plaintiffs' Securities Act claims directed to the Sarbanes-Oxley certification is therefore granted.
4. The Complaint Alleges an Actionable Omission as to the August 2015 Margin Call.
Plaintiffs allege that the Offering Documents omitted the material fact that, on or about August 7, 2015, "the Company had likely breached the debt covenants under the Margin Loan," thereby triggering a margin call and requiring the Company to post at least $159 million in additional collateral. (Compl't ¶ 332.) The Preferred Offering was announced shortly thereafter, on August 18, 2015.
Defendants argue that the failure to explicitly disclose the margin call was not material because if a reasonable investor reviewed past SEC filings, he or she could have inferred that a margin call had issued based on the price of TERP common stock. For reasons that will be explained, the Court cannot conclude, as a matter of law, that these past disclosures would have *472 informed a reasonable investor of the likely existence of a margin call. The Complaint plausibly alleges a material omission regarding the margin call.
"Section 11 of the Securities Act prohibits materially misleading statements or omissions in registration statements filed with the SEC." In re Morgan Stanley, 592 F.3d at 358 (citing 15 U.S.C. § 77k(a) ). Section 12(a)(2) prohibits material omissions for securities sold using a prospectus. Id. at 359. "For an omission to be actionable, the securities laws must impose a duty to disclose the omitted information." Id. at 360 (quoting Resnik v. Swartz, 303 F.3d 147, 154 (2d Cir. 2002) ). The disclosure duty may be based on an affirmative obligation set by regulation or statute, or it may derive from a necessity to avoid misleading statements contained in offering documents. Id. at 361-66. "[W]hen an offering participant makes a disclosure about a particular topic, whether voluntary or required, the representation must be 'complete and accurate.' " Id. at 366 (quoting Glazer v. Formica Corp., 964 F.2d 149, 157 (2d Cir. 1992) ).
An omission's materiality is a mixed question of law and fact, and a statement's materiality "will rarely be dispositive in a motion to dismiss: '[A] complaint may not properly be dismissed ... on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.' " Id. at 360 (quoting ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase, 553 F.3d 187, 197 (2d Cir. 2009) ); see also In re ProShares Tr. Sec. Litig., 728 F.3d 96, 102 (2d Cir. 2013) (dismissal is appropriate "where the alleged omission was so obviously unimportant to a reasonable investor that reasonable minds would agree on that omission's unimportance.") (quotation marks omitted).
At the same time, "the materiality hurdle remains a meaningful pleading obstacle," and "the Supreme Court has been 'careful not to set too low a standard of materiality,' for fear that management would 'bury the shareholders in an avalanche of trivial information.' " Id. (quoting Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 131 S.Ct. 1309, 1318, 179 L.Ed.2d 398 (2011) ). "In judging whether an alleged omission was material in light of the information already disclosed to investors, we consider whether there is 'a substantial likelihood that the disclosure of the [omitted material] would have been viewed by the reasonable investor as having significantly altered the total mix of information [already] made available.' " ProShares, 728 F.3d at 102 (emphasis and alterations in original; quoting DeMaria v. Andersen, 318 F.3d 170, 180 (2d Cir. 2003) ); accord Stadnick, 861 F.3d at 37 ("The operative test remains that set forth in DeMaria."). The materiality analysis is "inherently fact-specific." Hutchison v. Deutsche Bank Sec. Inc., 647 F.3d 479, 485 (2d Cir. 2011). Courts consider whether the misstatement or omission implicates a business segment that plays a significant role in the company's operations or profitability, and whether management expects that the misstatement or omission will result in a significant market reaction. Id.
In arguing that omission of the margin call was immaterial, defendants walk through the description of the Margin Loan contained in the Company's Form 10-Q for the first quarter of 2015, which the Offering Documents incorporated by reference. In that filing, SunEdison disclosed that it had entered into the Margin Loan for the purpose of acquiring First Wind Holdings, LLC. (Bartlett Dec. Ex. 9 at 22.) Under the heading "Margin Loan,"
*473 the Form 10-Q stated that on January 29, 2015, a wholly-owned subsidiary of the Company entered into a Margin Loan Agreement "pursuant to which SunEdison guaranteed all of the subsidiary's obligations under the Margin Loan Agreement. Under the Margin Loan Agreement, the subsidiary borrowed $410 million in term loans." (Id. )
The 10-Q stated that the Margin Loan Agreement required that the loan-to-value ratio could not exceed 50% of the value of TERP common stock. (Id. ) In other words, SunEdison pledged at least $820 million in TERP common stock as collateral against the $410 million loan amount. (Sec. Def. Mem. at 13.) If that ratio was not maintained, the Company would be required to post additional cash collateral and/or repay a portion of the loan. (Bartlett Dec. Ex. 9 at 22.) "In addition, the Margin Loan Agreement requires the repayment of all or a portion of the term loans made thereunder upon the occurrence of certain events customary for financings of this nature, including other events relating to the price, liquidity or value of the [TERP] Common Stock ...." (Id. )
That same 10-Q further disclosed that the Company had amended a February 2014 credit agreement in order to facilitate the Margin Loan. (Id. at 23.) That original credit agreement was annexed to SunEdison's Form 10-K for 2014, as Exhibit 10.130. (Bartlett Dec. Ex. 2 at 70.) The amendment defined the term "Margin Loan Pledged Equity" to mean "up to 32,200,000 class B units of common stock ... of [TERP]," "up to "32,200,000 class B Units of TerraForm Power, LLC" and "up to 50% of non-voting membership interests in TerraForm Power, LLC conferring certain incentive distribution rights to SunEdison Holding Corporation by Terraform Power, LLC pursuant to its Organization documents." (Bartlett Dec. Ex. 2 at 73.)
According to defendants, investors could estimate the TERP stock price that would trigger a margin call by reading the 10-Q alongside the February 2014 credit agreement. Defendants explain:
Multiplying that figure [of 32.2 million shares] by the publicly known trading price of [TERP] stock provides an approximation of the value of the margin loan collateral on any given day. Combined with the publicly disclosed requirement of a 2:1 value to loan ratio, investors could readily ascertain when a margin call might be triggered.
(Sec. Def. Mem. at 14.)
Defendants' proposed arithmetic exercise would still leave a reasonable investor uncertain as to whether, in fact, a margin call had been made. In defendants' own words, such an investor would be left with only "an approximation" of the collateral required by the Margin Loan agreement, and an estimate of when a margin call "might be triggered." (Id. ) At the time the Offering Documents were disseminated, however, the margin call allegedly had been made, and a reasonable investor should not have been expected to engage in estimation and guesswork when the fact of the margin call was known to management.
Moreover, the definition of "Margin Loan Pledged Equity" contained in the 2014 amendment does not limit collateral solely to the value of TERP common stock. It includes 50 percent of non-membership voting interests and incentive distribution rights in an LLC. (Bartlett Dec. Ex. 2 at 73.) The value of these distribution rights as collateral on the Margin Loan may have been minimal and immaterial, or they may have been substantial. A reasonable investor would have no way of knowing, and would have remained in the dark about the existence of the margin call.
*474 This is not, as defendants urge, an instance where a reasonable investor could have calculated the timing of a margin call based on a straightforward calculation. For instance, in Nguyen v. MaxPoint Interactive, Inc., 234 F.Supp.3d 540, 547 (S.D.N.Y. 2017), Judge Swain concluded that defendants adequately disclosed that its top 25 customers accounted for "nearly 50 percent of its revenue," placing investors "on clear notice" of the company's "reliance on a small number of customers for a majority of its revenue." "[S]imple arithmetic computation based on the information disclosed would have revealed that the remaining 51 percent of MaxPoint's revenues were derived from the other 95 percent of its customers and slightly more complex calculations would have enabled an investor to make more refined analyses of concentrations within that customer base ...." Id.; see also Starr ex rel. Estate of Sampson v. Georgeson Shareholder, Inc., 412 F.3d 103, 110 (2d Cir. 2005) (affirming dismissal when only "a superficial or careless reading of these documents" would have misled investors); In re Pretium Res. Inc. Sec. Litig., 256 F.Supp.3d 459, 475 (S.D.N.Y. 2017) (statements made by mining company "substantially disclosed" work in atypical terrain) (Broderick, J.).
The Complaint adequately alleges that the descriptions of the Margin Loan's collateral requirements were opaque, and a reasonable investor would not be able to conclude with any confidence when or whether a margin call had issued. The fact that a margin call had been made allegedly was known to defendants. Plaintiffs have plausibly alleged that a reasonable investor would have considered the existence of the margin call as having significantly altered the total mix of information. See generally ProShares, 728 F.3d at 102. It would have signaled to investors that the potential financing risks described in the Company's past SEC filings were becoming realized, and that the Company was encountering difficulties in obtaining much-needed liquidity infusions. Given the context of the Company's statements about the critical role of access to financing, the Complaint has plausibly alleged that the margin call was material.
The Court therefore concludes that the Complaint plausibly alleges that the Securities Act defendants materially omitted information related to the margin call, and defendants' motion to dismiss this claim is denied.
5. The Complaint Alleges that the Omission of the Second-Lien Loan Was Material.
Plaintiffs allege that defendants violated the Securities Act by failing to disclose the $169 million, Second-Lien Loan that the Company took from Goldman Sachs, which closed on August 11, 2015. (Compl't ¶ 461-64.) Plaintiffs characterize it as an "emergency" loan. It had an annual interest rate of 9.25% and an origination fee of $9 million. (Compl't ¶ 102.) The Complaint also alleges that disclosure of the second-lien loan would have informed investors that SunEdison's others assets were subject to a first lien, meaning that the Company was unlikely to obtain further financing on favorable terms. (Compl't ¶ 102.) The loan was finalized on August 11, 2015, and was not publicly disclosed until November 10, 2015. (Compl't ¶ 103.) Plaintiffs allege that the Second-Lien Loan had "onerous terms" and raised a "material conflict of interest arising from the fact that Goldman Sachs was one of the lead underwriters on the offering." (Compl't ¶ 462.)
The Complaint states that under the heading "Recent Events," the Offering Documents described other loans taken out by the Company, including the Margin *475 Loan, a warehouse credit facility and a $150 million term loan from Deutsche Bank, but that it omitted the existence of the Second-Lien Loan. (Compl't ¶ 461.) The Company also disclosed the existence of a separate loan that it entered into one day before the August 18, 2015 Preferred Offering. (Compl't ¶ 462.)
Defendants argue that disclosure of the Second-Lien Loan was not required because it was immaterial. As noted, Hutchison observed that materiality is inherently fact-specific, and does not lend itself to a "formulaic approach." 647 F.3d at 485. Defendants point to Hutchison's reliance on SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45,150 (1999), which considered both quantitative and qualitative factors for reviewing materiality. The SEC concluded that, as a rule of thumb, the agency's auditors could assume materiality for an omission or misstatement that would cause a 5% deviation in earnings or income, but that "all relevant considerations" must be weighed, and that auditors "must consider both 'quantitative' and 'qualitative' factors in assessing an item's materiality." Id. at *2. The SEC cautioned that "[q]ualitative factors may cause misstatements of quantitatively small amounts to be material," and listed numerous factors, including market reaction, for weighing an item's materiality. Id. at *3-4. Defendants argue that applying the rationale of the SEC bulletin, the Second-Lien Loan was not quantitatively material because it amounted to less than 1.5% of SunEdison's indebtedness. (Sec. Def. Mem. at 15.)
Defendants misread the SEC bulletin and Hutchison. The SEC bulletin cautioned agency auditors against applying a bright-line rule for deciding materiality. 64 Fed. Reg. 45,150 at *2-4. It did not conclude that a misstatement or omission causing a deviation of less than 5% was per se immaterial. Hutchison and the SEC warned against adopting such a "formulaic approach." 647 F.3d at 485.
As to whether the loan was qualitatively immaterial, defendants principally argue that the Complaint repeatedly lumps the loan's $9 million origination fee into its 9.25% interest rate, and inaccurately describes the loan as having an aggregate 15% interest rate. (Sec. Def. Mem. at 15-16.) But the Complaint describes the terms of this loan, including the distinction between the interest rate and the origination fee, and merely recalculates an aggregate, effective percentage rate. (Compl't ¶ 102.) Plaintiffs' rhetorical choice of how to describe the loan's terms does not meaningfully affect the materiality analysis.
At the pleading stage, the Court concludes that there is a substantial likelihood that disclosure of the Second-Lien Loan would have significantly altered the total mix of information as viewed by a reasonable investor. See ProShares, 728 F.3d at 102. The Complaint adequately alleges that the Second-Lien Loan was different in nature from the Company's already-disclosed loans. First, the Complaint asserts, and defendants do not dispute, that the 9.25% interest rate significantly exceeds the average 2.68% rate for the Company's other debt arrangements. (Compl't ¶ 102.) Second, the Complaint alleges, and defendants do not dispute, that the second-lien character of the loan differed from other loans taken by the Company, and indicated that no first-lien assets were available as collateral. (Compl't ¶ 102.)
Third, the Complaint alleges that, based on the timing of the Second-Lien Loan, the Company needed this "emergency" loan in order to pay the margin call. (Compl't ¶ 118-19.) The Complaint alleges that payment on the margin call was due on August 11, 2015, which is the same date that the Second-Lien Loan closed. (Compl't ¶ 118.) At the pleading stage and *476 in the context of surrounding allegations, the Complaint plausibly alleges that the Company urgently needed the Second-Lien Loan in order to pay the undisclosed margin call. In context, the Second-Lien Loan was not routine financing of the type identified and anticipated by the Company's past disclosures, but a uniquely expensive loan taken out to resolve the exigencies of the undisclosed margin call. Quantitatively, the loan may have totaled only 1.5% of the Company's total debt obligations, but qualitatively, the timing and terms of the Second-Lien Loan may have been indicative of a company struggling with liquidity shortfalls and limited financing options. The Complaint plausibly alleges that the existence and terms of the Second-Lien Loan would have significantly altered the total mix of information as viewed by a reasonable investor. ProShares, 728 F.3d at 102.
The Court therefore concludes that the Complaint plausibly alleges a material omission as to the Second-Lien Loan.
6. The Complaint Alleges an Actionable Misstatement as to the Company's Debt Classification.
Plaintiffs assert that the Form 10-Qs for the first and second quarters of 2015 were materially false and misleading in listing debt on the Margin Loan and Exchangeable Notes as "non-recourse," meaning that lenders could not recover funds directly from SunEdison. (Compl't ¶¶ 36-40, 467-69.) Under the heading "DEBT AND CAPITAL LEASE OBLIGATIONS," the two 10-Qs listed the Margin Loan and the Exchangeable Notes in a chart, and identified them as "[n]on-recourse to SunEdison." (Compl't ¶ 467.) Plaintiffs allege that in truth, the Margin Loan and Exchangeable Notes allowed for full-recourse remedies against the Company directly. (Compl't ¶¶ 36-40, 467-69.)
Defendants point to other portions of the two 10-Qs that accurately described creditors' direct recourse against SunEdison. Both 10-Qs included passages that described the Margin Loan, and stated that "SunEdison concurrently entered into a guaranty agreement ... pursuant to which SunEdison guaranteed all of the subsidiary's obligations under the Margin Loan Agreement.... Upon the occurrence and during the continuance of an event of default, any lender may ... exercise remedies with respect to the collateral and demand payment from SunEdison of the obligations under the Margin Loan Agreement then due and payable." (Bartlett Dec. Ex. 9 at 22; Bartlett Dec. Ex. 10 at 25.) SunEdison separately stated that "[t]he Exchangeable Notes are fully and unconditionally guaranteed by SunEdison." (Bartlett Dec. Ex. 9 at 23.) Defendants also point to the text of the Margin Loan Agreement, which "provide[d] for full recourse to the Parent [SunEdison] under the Parent Guaranty." (Reply Dec. Ex. 45 at Ex. 10.1 p. 63 ¶ 4.22(b).)
The Second Circuit has stated that "[t]he central inquiry" in reviewing materiality is "whether defendants' representations, taken together and in context, would have misled a reasonable investor about the nature of the investment." I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., 936 F.2d 759, 761 (2d Cir. 1991) (quotation marks and alteration omitted); see also Halperin, 295 F.3d at 357 ("The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered."). Documents must be read as a whole, and not in a piecemeal fashion. See *477 Bioscrip, Inc. Sec. Lit., 2015 WL 3540736, at *6 (S.D.N.Y. June 5, 2015) (Nathan, J.) (citing Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2, 5 (2d Cir. 1996) ).
Read as a whole and in context, a reasonable investor would not be able to determine whether recourse against SunEdison was available for these debts. The two 10-Qs described contradictory and irreconcilable facts. In the narrative descriptions of the Margin Loans and the Exchangeable Notes, investors were expressly informed that these were recourse debts. However, elsewhere in the filings, these debts were expressly listed as non-recourse, and included in the total calculations for the Company's non-recourse debt. A reasonable investor would be left with no way of discerning which description was accurate.
According to the Complaint, a UBS analyst observed on August 25, 2015 that investors lacked information on "simple items" such as "how much debt is actually recourse to SunEdison," and added, "More broadly, we see characterization of debt between recourse and non-recourse in recent disclosures as potentially reducing mgmt. credibility." (Compl't ¶ 124.) The confusion as to whether the debt was recourse or non-recourse is further underscored by statements allegedly made by Chatila and Wuebbels in a November 2015 call with Deutsche Bank, in which they allegedly explained that the margin call required the company "to reclassify the loan from non-recourse to recourse," and explained that the classification of the exchangeable notes in the prior 10-Q as non-recourse "was due to clerical error." (Compl't ¶ 369.)
Because the Form 10-Qs set forth conflicting descriptions of the recourse against SunEdison's debt, including the misstatement that the debt was non-recourse, the Complaint plausibly alleges a material misstatement about the classification of Company debt.
7. Any Claim Alleging a Misstatement about the Use of Proceeds from the Preferred Offering Is Dismissed.
The Complaint alleges that defendants misleadingly omitted that funds raised in the Preferred Offering would be used toward the margin call and to address other pressing liquidity needs. (Compl't ¶ 464.) It asserts that the Company left purchasers in the Preferred Offering with a misimpression that proceeds would be used toward future growth opportunities, as opposed to deal with existing obligations. (Compl't ¶ 464.)
But the Offering Documents expressly stated that "our management will retain broad discretion over the use of the need proceeds from this offering." (Compl't ¶ 463.) As quoted in the Complaint, under the heading "USE OF PROCEEDS," the Company stated:
We expect to use the net proceeds of this offering for general corporate purposes, which we expect to include funding working capital and growth initiatives. At this time, we have not specifically identified a large single use for which we intend to use the net proceeds, and, accordingly, we are not able to allocate the net proceeds among any potential uses in light of the variety of factors that will impact how such net proceeds will ultimately be utilized by us. As a result, our management will retain broad discretion over the use of the net proceeds from this offering.
(Compl't ¶ 463.)
The Company expressly informed investors that the proceeds of the Preferred Offering were not going toward any specific purpose, but for "general corporate purposes," including "funding working capital."
*478 It stated that "we are not able to allocate the net proceeds among any potential uses in light of the variety of factors that will impact how such net proceeds will ultimately be utilized by us." (Compl't ¶ 463.) A reasonable investor reviewing this statement would be left with an impression that the Company intended to use funds from the Preferred Offering for any number of corporate uses.
The defendants' motion to dismiss plaintiffs' Securities Act claims directed to the use of proceeds from the Preferred Offering is therefore granted.
C. The Motion to Dismiss Plaintiffs' Section 15 Claim Is Denied.
The Complaint alleges that Chatila, Wuebbels and the Director Defendants violated Section 15 of the Securities Act. (Compl't ¶¶ 528-33.) "Section 15 imposes joint and several liability on '[e]very person who, by or through stock ownership, agency, or otherwise ... controls any person liable under' § 11." In re Lehman Bros. Mortgage-Backed Sec. Litig., 650 F.3d 167, 185 (2d Cir. 2011) (quoting 15 U.S.C. § 77o (a) ). A plaintiff must allege a primary violation of section 11 and the defendants' control of a primary violator. Id. Control is defined as " 'the power to direct or cause the direction of the management and policies of [the primary violators], whether through the ownership of voting securities, by contract, or otherwise.' " Id. (quoting SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472-73 (2d Cir. 1996) ).
In a footnote, defendants argue that the section 15 claim should be dismissed because the Complaint fails to allege a primary violation under sections 11 or 12(a)(2). (Sec. Def. Mem. at 25 n.14.) It does not urge dismissal of the section 15 claim on any other grounds.
Because the Court concludes that the Complaint has alleged a primary violation, defendants' motion to dismiss the section 15 claim is denied.
II. PLAINTIFFS' EXCHANGE ACT CLAIMS ARE DISMISSED IN PART.
A. Overview of Section 10(b) and Rule 10b-5.
Count One alleges that Chatila and Wuebbels violated section 10(b) and Rule 10b-5 by making or approving false statements, and did so with knowledge or reckless disregard of the fact that they were materially false and misleading. (Compl't ¶¶ 404-12.) The Complaint also alleges control-person liability against Chatila and Wuebbels under section 20(a). (Compl't ¶ 413-23.)
Section 10(b) makes it unlawful to "use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). To state a claim under section 10(b) and Rule 10b-5, " 'a plaintiff must allege that [each] defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury.' " Indiana Pub. Ret. Sys., 818 F.3d at 93 (quoting ATSI, 493 F.3d at 105 ).
As the Second Circuit has noted, a plaintiff bringing a securities fraud claim under section 10(b) must allege facts not required for claims under sections 11 and 12(a)(2) of the Securities Act, specifically including scienter, reliance and loss causation. In re Morgan Stanley, 592 F.3d at 359. Defendants under the Securities Act may be liable on the basis of strict liability or *479 negligence, FHFA, 873 F.3d at 99, whereas a successful claim under section 10(b) must allege facts that raise a strong inference that defendants intentionally or recklessly omitted or misstated material information, Indiana Pub. Ret. Sys., 818 F.3d at 93.
As to Chatila and Wuebbels, the plaintiffs assert that certain of their alleged misstatements or omissions violated both the Exchange Act and the Securities Act. The Court has ruled on whether the Complaint alleges a material misstatement or omission under the Securities Act, and those conclusions apply equally to the Exchange Act claims. Thus, for the reasons explained, the Court concludes that for the purposes of the Exchange Act claims, the Complaint has alleged that Chatila and Wuebbels failed to disclose the existence of the August 2015 margin call and the Second-Lien Loan, and made a material misstatement as to the Company's classification of certain debts as being both recourse and non-recourse.
The Court separately concludes that the Complaint fails to allege facts that raise a strong inference of scienter for these misstatements and omissions. Plaintiffs do not allege that Chatila and Wuebbels personally benefited from any misstatement or omission, and instead attempt to allege scienter on the basis that they recklessly misstated or omitted material information. As will be explained, the Court concludes that plaintiffs have not raised a cogent and compelling inference of scienter for the previously discussed misstatements and omissions.
The Complaint also identifies a variety of alleged misstatements and omissions that allegedly violated section 10(b) and Rule 10b-5. The Complaint adequately alleges that Chatila knowingly misstated the projected date wherein SunEdison would begin to generate cash, thus identifying a misstatement accompanied by scienter. As to all other alleged misstatements and omissions exclusively brought under the Exchange Act, the Complaint has failed to identify an actionable misstatement accompanied by scienter.
With the exception of the allegation against Chatila that his statements about the projected date of cash generation was a material misstatement, plaintiffs' claims under section 10(b), Rule 10b-5 and section 20(a) are dismissed.
B. The Motion to Dismiss Plaintiffs' Exchange Act Claims Is Granted in Part.
1. The Complaint Adequately Alleges that Chatila's Statement on the Timing of SunEdison's Cash Generation Violated Section 10(b) and Rule 10b-5.
The Court concludes that the Complaint adequately alleges that Chatila misrepresented the point in time at which SunEdison expected to generate cash, and did so shortly after receiving information that contradicted his public statement. In a September 2, 2015 article published by Bloomberg , Chatila stated, "The most important question for investors is when do we start generating cash for a living. I have said it's at the end of 2016 or early 2017. But we've been signaling it's going to be a lot sooner than that, probably early 2016 or late 2015." (Compl't ¶¶ 127, 333.)
According to the Complaint, "[d]ays earlier," on August 27, 2015, an internal presentation to SunEdison's board projected that, at the earliest, the Company would begin to see positive cash flows in the second quarter of 2016. (Compl't ¶¶ 129, 334.) The Complaint states that in that August 27 presentation, Chatila and Wuebbels informed the SunEdison board that the Company would be cash-negative in the fourth quarter of 2015 and the first *480 quarter of 2016. (Compl't ¶ 335.) Later, on October 19, 2015, Chatila and Wuebbels allegedly told the Company's senior management that SunEdison would "have a substantial net reduction in cash on hand" from the fourth quarter of 2015 through the first quarter of 2018, from $425 million to $32 million. (Compl't ¶ 335.)
Typically, statements about a "company's projections [are] opinions rather than guarantees." Fait v. Regions Fin. Corp., 655 F.3d 105, 112 (2d Cir. 2011). " 'A statement of reasons, opinion or belief ... can be actionable under the securities laws if the speaker knows the statement to be false.' " Id. (quoting Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1131 (2d Cir. 1994) ). A complaint must include " 'allegations to support the inference that the defendants either did not have the[ ] favorable opinions on future prospects when they made the statements or that the favorable opinions were without a basis in fact.' " Id. (quoting In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 266 (2d Cir. 1993) ).
The Complaint has identified information allegedly known by Chatila that directly contradicted his stated opinion. Publicly, Chatila stated that SunEdison would start "generating cash" sooner than indicated by the Company's past statements, "probably early 2016 or late 2015." (Compl't ¶¶ 127, 333.) According to the Complaint, however, six days before making that projection, Chatila personally informed SunEdison's board that the Company would be cash-negative in the fourth quarter of 2015 and the first quarter of 2016. (Compl't ¶ 129.) Accepted as true, these allegations raise the inference that Chatila did not honestly hold such a favorable opinion on the Company's future prospects. Fait, 655 F.3d at 112. Moreover, no party has pointed to any cautionary language or qualification that accompanied Chatila's forward-looking statement. See 15 U.S.C. § 78u-5(c)(1).
The Complaint also alleges that this statement was made with scienter, as required by the PSLRA. Scienter may be alleged with particularity if allegations support a strong inference that a defendant "acted consciously and recklessly in ... misrepresenting financial information." Indiana Pub. Ret. Sys., 818 F.3d at 93. Circumstantial evidence of recklessness can include allegations that a defendant "knew facts or had access to information suggesting that their public statements were not accurate ...." ECA, 553 F.3d at 199. The speaker's recklessness must be "conscious," meaning "a state of mind approximating actual intent, and not merely a heightened form of negligence." Stratte-McClure, 776 F.3d at 106 (quoting S. Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 109 (2d Cir. 2009) ). The scienter inference must be "cogent and compelling, thus strong in light of other explanations." Tellabs, 551 U.S. at 324, 127 S.Ct. 2499.
Because Chatila allegedly had information that the Company would not generate cash until the second quarter of 2016, and that the Company would remain cash-negative in the near term, the Complaint adequately alleges that Chatila knew facts suggesting that his public statement was inaccurate. ECA, 553 F.3d at 199. Particularly in light of the close temporal proximity between Chatila's public statements and the alleged board presentation of contradictory information, the Complaint has raised a cogent and compelling inference that the alleged misstatement was reckless, as opposed to the product of newly learned information or a mere misunderstanding.
The Complaint has adequately alleged that Chatila's statement in the Bloomberg article of September 2, 2015 was a material *481 misstatement of his honest beliefs, and thus, states a claim under section 10(b) and Rule 10b-5.
2. For Purposes of the Exchange Act Claims, Plaintiffs Have Not Alleged Additional Actionable Misstatements or Omissions as to the Company's Liquidity.
In addition to the statements discussed above in relation to the Securities Act claims, plaintiffs assert that Chatila and Wuebbels materially misstated additional facts concerning the Company's liquidity on numerous occasions. The Court addresses each alleged misstatement, and the reason for its conclusion that they are not actionable under section 10(b) and Rule 10b-5.
a. The Form 10-Q for the Third Quarter of 2015.
In its MD & A discussion, the Company's Form 10-Q for the third quarter of 2015 stated that, as of September 30, 2015, the Company's "working capital is impacted by short-term borrowings and trade accounts payable used to construct renewable energy systems as well as the current portion of our long-term debt.... Our working capital can also fluctuate significantly from period to period as a result of the timing of cash inflows and outflows associated with our development and construction activities." (Compl't ¶ 349.) The same filing expressed the belief that the Company would have sufficient liquidity to support operations, but laid out "various factors [that] could affect our liquidity position":
While we continue to incur significant indebtedness to fund our operations and acquisitions and have significant pending obligations, we believe that the sources of liquidity described below will be sufficient to support our operations for the next twelve months, although various factors could affect our liquidity position, including changes in the anticipated timing and terms of pending and completed acquisitions and the availability of project capital. Accordingly, no assurances can be made that we will not require additional sources of liquidity to execute our business plan. Management continues to regularly monitor our ability to finance the needs of operating, financing and investing activities within the dictates of prudent balance sheet management as our long-term growth will require additional capital. Our ability to meet our debt service obligations and other capital requirements, including capital expenditures and acquisitions, will depend on various factors, including our future operating performance which, in turn, will be subject to general economic, financial, business, competitive, legislative, regulatory and other conditions, many of which are beyond our control.
(Compl't ¶ 349; see also Bartlett Dec. Ex. 12 at 69.) Plaintiffs allege that Chatila and Wuebbels materially misrepresented the Company's liquidity by falsely stating that "we believe" that SunEdison had sufficient liquidity to support operations for the next twelve months. (Compl't ¶ 349.)
Defendants point to risk disclosures made in the same MD & A discussion. The following statements were made immediately prior to the language quoted in the Complaint:
We incurred a net loss attributable to SunEdison stockholders of $284 million and $919 million for the three and nine month period ended September 30, 2015 respectively.... We expect to continue to incur losses, and we expect our operations, including our acquisition activities, to continue to require substantial cash expenditures, cash commitments and third party financing.... Our working capital is impacted by short-term borrowing *482 and trade accounts payable used to construct renewable energy systems as well as the current portion of our long-term debt.... Our working capital can also fluctuate significantly from period to period as a result of the timing of cash inflows and outflows associated with our development and construction activities.
(Bartlett Dec. Ex. 12 at 69.)
Later in the filing, under the heading "Risks Related to Liquidity and Capital Resources," the filing states, in bolded, italicized language:
We have capital intensive business, a significant amount of indebtedness and upcoming payments with respect to completed and pending acquisitions that require significant cash flow from operations and funds from various financing sources that may not be available in the future and as a result our business could be adversely affected, including our ability to develop new projects and fund our regular operational needs. We have also incurred losses and used substantial cash in our operating activities and we expect to continue to incur losses and use cash in our operating activities.
(Bartlett Dec. Ex. 12 at 85; emphasis in original.) The filing proceeded to advise:
Debt or equity financing may not be available to us, or available at terms and conditions that we find acceptable, which could significantly impact our earnings and liquidity. Debt financing, if available, could impose additional cash payment obligations. We will need to raise additional funds in the future in order to meet the operating and capital needs of our renewable energy development business, including the acquisition and construction of renewable energy projects.... While funds for project developments are expected to be in the form of non-recourse project finance capital, such project financing or equity may not be available to us, or available at terms and conditions we find acceptable.... If we are unable to secure additional financing, our earnings, liquidity and ability to develop projects will be adversely impacted and we may not be able to maintain compliance with our existing debt covenants and our business will suffer.
(Bartlett Dec. Ex. 12 at 85.)
The liquidity descriptions fall comfortably within the safe harbor provision of the PSLRA, 15 U.S.C. § 77u-5(c). The alleged falsehood is a forward-looking, opinion-based statement about what the speaker "believe[d]" as to the Company's future liquidity. The very same sentence acknowledged that the Company continued to incur "significant indebtedness" and had "significant pending obligations." Discussion of the Company's liquidity also included "meaningful cautionary statements" that "identif[ied] important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i). In emphasized language, the filing's risk disclosures warned of "a significant amount of indebtedness," upcoming payment obligations that required funding "that may not be available in the future," and the acknowledgment that the Company had "incurred losses" and the expectation that it would "continue to incur losses ...." (Bartlett Dec. Ex. 12 at 85.)
The Court therefore concludes that because the statement contained in the 10-Q for the third quarter of 2015 was forward-looking and accompanied by meaningful cautionary statements, plaintiffs have failed to allege a material misstatement under section 10(b) and Rule 10b-5.
*483 b. The Form 10-Qs for the Second and Third Quarters of 2014.
The Form 10-Qs for the second and third quarters of 2014 included the following statement, which plaintiffs allege was materially misleading: "We believe our liquidity will be sufficient to support our operations for the next twelve months, although no assurances can be made if significant adverse events occur, or if we are unable to access project capital needed to execute our business plan." (Compl't ¶¶ 261, 276.)
The discussion of liquidity in the MD & A sections also noted that the Company would "need to raise additional funds in the future in order to meet the operating and capital needs" of its solar energy business, and that additional funds either may not be available or may be offered on unacceptable terms. (Bartlett Dec. Ex. 7 at 44; Ex. 8 at 48.) It stated, "In the event we are unable to raise additional funds, our liquidity will be adversely impacted, we may not be able to maintain compliance with our existing debt covenants and our business will suffer. If we are able to secure additional financing, these funds could be costly to secure and maintain and could significantly impact our earnings and our liquidity." (Bartlett Dec. Ex. 7 at 45; Ex. 8 at 48.) The 10-Qs also included meaningful cautionary language as to the challenged forward-looking statements contained therein. (Bartlett Dec. Ex. 7 at 51-52; Ex. 8 at 55-56.)
The Complaint does not allege facts that would tend to show that Chatila or Wuebbels had "actual knowledge" that SunEdison's statements concerning liquidity were "false or misleading." 15 U.S.C. § 78u-5(c)(1)(B)(i). The statements were expressly forward-looking, qualified and accompanied by cautionary language. Moreover, the Complaint does not include facts that would tend to show that these statements concerning the Company's liquidity over the coming year were actually false. The Complaint's own allegations describe a course of conduct whereby SunEdison was rapidly acquiring liquidity and spending it on acquisitions and new projects. While the Company accrued significant debt, in the year that followed the filing of these two 10-Qs, and ultimately was driven to bankruptcy, it continued to have access to creditors, and made two notes offerings and the Preferred Offering.
The Court therefore concludes that the Complaint does not adequately allege that these statements were false or misleading.
c. Oral Statements Made by Chatila and Wuebbels on Earnings Calls.
Plaintiffs cite to various oral statements made on SunEdison's earnings calls during 2014 and 2015, and assert that Chatila and Wuebbels made materially false and misleading statements about the Company's liquidity positions. Specifically, plaintiffs cite the following statements:
An August 7, 2014 earnings call in which Wuebbels stated that "we remain comfortable with our balance sheet and our liquidity position" and described a "solid liquidity position ...." (Compl't ¶ 262.)
A November 6, 2014 earnings call in which Wuebbels stated that "we remain comfortable with our balance sheet and our liquidity position." (Compl't ¶ 277.)
An October 7, 2015 presentation in which Chatila and Wuebbels described the Company's liquidity position as "robust" and "strong." (Compl't ¶ 341.)
These statements reflected vague and broad opinions on the part of the speaker, and the Complaint does not allege that they were not honestly held at the time that they were made. See, e.g., In re Lehman Bros. Sec. & ERISA Litig., 799 F.Supp.2d 258, 289 (S.D.N.Y. 2011) ("[T]he statements that Lehman's liquidity pool *484 was sufficient to meet its expected needs over the next twelve months and that its liquidity position was 'strong' were statements of opinion.") (Kaplan, J.); Silberstein v. Aetna, Inc., 2015 WL 1424058, at *14-15 (S.D.N.Y. Mar. 26, 2015) (description of "robust" oversight was an opinion) (Nathan, J.). Moreover, the statements of 2014 pre-date the Company's rapid expansion of 2015 and the pressing liquidity needs described in the Complaint.
The Court therefore concludes that the Complaint does not adequately allege that these characterizations of the Company's liquidity were material misstatements.
d. The Use of the SunEdison's Warehouse Credit Facility in the Company's Calculations of Overall Liquidity.
The Complaint identifies a series of alleged misrepresentations about SunEdison's liquidity. Unlike the other alleged misrepresentations about the Company's liquidity, these statements did not involve a forward-looking or opinion-based assertion. Rather, these allegations identify statements about the actual, calculable value of SunEdison's liquidity, and assert that they were objectively false.
As will be explained, there is a distinction between "liquidity" and "capital resources," yet both concepts are commonly discussed in the same portion of the "Management's Discussion and Analysis of Financial Conditions and Results of Operations" in a registrant's periodic SEC filings. To understand plaintiffs' claim, it is important to discern whether a reasonable investor would have understood management to be speaking of both concepts, or one to the strict exclusion of the other.
The Complaint identifies the following alleged misstatements concerning SunEdison's "liquidity":
• In an August 6, 2015 conference call, Wuebbels stated that the DevCo specifically had "greater than $1 billion of cash and sufficient liquidity to support the future growth of the platform." (Compl't ¶ 309.)
• The Form 10-Q for the third quarter of 2015 asserts that, as of September 30, 2015, SunEdison had "approximately $1.3 billion comprised of cash and cash equivalents." The Form 10-Q also claimed that the Company's "Renewable Energy Segment" had $1.3 billion in "cash and cash equivalents and cash committed for construction projects." (Compl't ¶ 350.)
• In a November 10, 2015 conference call, Wuebbels stated, "we have sufficient liquidity ... with approximately $1.4 billion as of the end of the quarter." (Compl't ¶ 351.)
• In an October 7, 2015 conference call, Wuebbels stated that, excluding the cash from the two YieldCos, "the cash available to the standalone DevCo, was standing at approximately $1.4 billion at the end of the quarter, up from $900 million at the end of the second quarter." (Compl't ¶ 337.)
• In an October 7, 2015 update, the Company stated that it had $1.3 billion in available cash at the end of the year's third fiscal quarter. (Compl't ¶¶ 338-39.)
• In a November 18, 2015 meeting with Deutsche Bank, Chatila and Wuebbels were asked, "How much cash does the company really have?" They responded: "SUNE has roughly $1.35b of cash with about $700m of that cash held in project companies earmarked for working capital purposes. Timing of cash movements and the fact that SUNE gets EPC margin from these projects means that the cash can be utilized for other capital needs." (Compl't ¶ 365.)
*485 Plaintiffs contend that these statements improperly incorporated potential funding from a "warehouse credit facility," which was a $500 million financing arrangement that SunEdison made with First Reserve Corp. in May 2015. (Compl't ¶ 105-06.) Under the warehouse credit facility, the Company pre-negotiated with its lenders certain parameters for the funds' use. (Compl't ¶ 106.) If a project satisfied the criteria, SunEdison simply could draw down the warehouse financing. (Compl't ¶ 106.) Based on these allegations and the documents incorporated by reference, a credit facility that is available but not drawn upon may be more properly characterized as a "capital resource" instead of a component of "liquidity."
Plaintiffs allege that because access to the credit facility was restricted to certain types of pre-approved projects, they should not have been included in the Company's public statements about its available liquidity. (Compl't ¶ 107.) Plaintiffs allege that in or around October 2015, the Company's cash holdings were far lower than stated by Chatila and Wuebbels, and cite to estimates that vary between $22 million, $90 million, $342 million and $497 million. (Compl't ¶¶ 144, 353.)
Informal SEC guidance discusses registrants' obligations to describe company "liquidity," and the related concept of "capital resources."[6] That guidance observes that "[t]he majority of registrants combine their discussion of these two items due to the degree of overlap which exists among the requirements. A key objective of the liquidity and capital resources discussion is to provide a clear picture of the company's ability to generate cash and to meet existing known or reasonably likely future cash requirements." SEC Financial Reporting Manual, Topic 9-Management's Discussion and Analysis of Financial Position and Results of Operations (MD & A), § 9210.1 (Sept. 30, 2008). This guidance states that "[l]iquidity is the ability of the registrant to generate adequate amounts of cash to meet its needs for cash." Id. § 9210.2. Similarly, "disclosures related to capital resources include a discussion of material commitments for capital expenditures, the general purpose of any commitments and how these commitments will be funded ...." Id. § 9210.3.
The SEC advises registrants to discuss cash requirements, sources and uses of cash, and material trends and uncertainties when describing liquidity and capital resources. Id. § 9210.4. Past statements of the SEC gave similar guidance concerning a registrant's obligations to describe external financing as part of its MD & A discussion of liquidity and capital resources. See Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations, 68 Fed. Reg. 75,056 -01, 75,064 (Dec. 29, 2003) ("[D]iscussion and analysis of the types of financing that are, or that are reasonably likely to be, available (or of the types of financing that a company would want to use but that are, or are reasonably likely to be, unavailable) and the impact on *486 the company's cash position and liquidity, should be considered and may be required.").
The Company's MD & A discussions referred to the warehouse credit facility as a source of both "liquidity" and "capital resources." The 10-Q for the second quarter of 2015 broadly defined the Company's liquidity as consisting of "[c]ash and cash equivalents, plus cash committed for construction projects ...." (Bartlett Dec. Ex. 10 at 61.) Under the heading "Liquidity," the 10-Q also stated that "our recently completed warehouse financing structures have also contributed to our capital resources." (Id. ) Thus, although described under the heading of "Liquidity," the Form 10-Q properly characterized the facility as a "capital resource[ ]." (Id. )
The same 10-Q reported that on May 6, 2015, SunEdison acquired a "Warehouse 1.0 Credit Facility" of up to $550 million from First Reserve for the purpose of acquiring and constructing renewable energy facilities. (Bartlett Dec. Ex. 10 at 63-64.) It separately described the warehouse credit facility "as an investment vehicle for the acquisition and construction of renewable energy projects. Warehouse 1.0, through its wholly-owned subsidiaries, intends to acquire renewable energy projects from SunEdison and other third parties and intends to sell such projects to TerraForm upon completion thereof." (Bartlett Dec. Ex. 10 at 24.) It stated that, as of June 30, 2015, "no amounts were committed for currently funded projects, which would reduce the available capacity." (Id. ) Based on these statements, a reasonable investor would have understood that the credit facility was not available for general corporate purposes, but "for the acquisition and construction of renewable energy projects." (Id. )
The 10-Q for the third quarter of 2015 listed "warehouse vehicles and other similar partnerships" as "a principal source[ ] of liquidity" for the Company's renewable energy segment. (Bartlett Dec. Ex. 12 at 70.) That same filing described the "First Reserve Warehouse" as "an investment vehicle for the acquisition and construction financing of renewable energy projects." (Bartlett Dec. Ex. 12 at 80.) It stated, "The First Reserve Warehouse is currently financing the construction of Comanche, a 120 MW solar project located in Colorado." (Bartlett Dec. Ex. 12 at 30.) The 10-Q does not appear to disclose the amount of funding that went to Comanche. Under the heading "Project Finance Outlook," the 10-Q stated that the Company expected that "capital needs will be obtained by the Renewal Energy Development segment through a combination of warehouse vehicle debt and equity ...," among other sources. (Bartlett Dec. Ex. 12 at 73.)
The Complaint also summarizes "cash walks" that Company management presented to analysts. In one of them, Wuebbels identified $673 million in total warehouse credit facilities, and stated that the funds would "offset" certain "organic construction expenses" that would otherwise affect SunEdison's cash balance. (Compl't ¶ 105.) A slide deck in a "cash walk" from the second quarter of 2015 identified $673 million in "liquidity" derived from "Warehouses, Net." (Compl't ¶¶ 110, 112.) A slide from the third quarter of 2015 did not refer to the warehouse credit facility, however. (Compl't ¶ 113.)
In short, the warehouse credit facility was disclosed to investors, and the Company identified it as a component in its overall calculation of "[c]ash and cash equivalents, plus cash committed for construction projects ...." (Bartlett Dec. Ex. 10 at 61.) The Company also identified the warehouse credit facility as a contributor to capital resources. (Id. ) Because the warehouse credit facility was disclosed, and *487 identified as a component of liquidity and capital resources, the Complaint does not adequately allege a materially false statement about the Company's liquidity.
As described in the SunEdison's 10-Qs, the credit warehouse facility was related to the Company's ability to generate cash, and, in that sense, was properly included in a discussion of liquidity, even though, in the absence of a drawdown, it had not yet become cash or a cash equivalent. The warehouse facility contributed to capital resources because it was a source of funding for capital expenditures, specifically as to the construction and acquisition of renewable energy projects. A reasonable investor would have understood how the credit facility factored into an analysis of liquidity and capital resources, and the Complaint does not plausibly allege that its inclusion in such analyses was a material misstatement.
The motion to dismiss plaintiffs' Exchange Act claims premised on the warehouse credit facility's inclusion in the Company's liquidity descriptions is therefore granted.
3. The Complaint Does Not Allege an Actionable Misstatement Based on a Projection Published on the Company Website.
On December 29, 2015, the Company's website included a chart projecting that the DevCo's business segment dedicated to the YieldCos' maintenance and management would generate $235 million in profits and $443 million in total revenue. (Compl't ¶ 379.) According to the Complaint, this projection was known to be false, because an internal company projection from mid-November showed a $21 million profit and $133 million in revenue. (Compl't ¶ 380.)
The Complaint does not include any details about who authored the internal projection or who reviewed it. A Wall Street Journal article of April 2016 referenced the November projection, with no additional discussion of its substance or distribution. (Compl't ¶ 380.) In contrast to the September 2015 projection of Chatila, which the Court has concluded is actionable, the Complaint does not allege that Chatila and Wuebbels had knowledge about the internal projection. The allegations concerning its contents and distribution are vague. Because the Complaint does not allege facts that would show that defendants knew this projection to be false, it fails to adequately allege a violation of section 10(b) and Rule 10b-5.
The motion to dismiss the Exchange Act claim directed to this projection is therefore granted.
4. The Complaint Does Not Allege that Chatila Made a Material Omission Concerning the Latin American Power Acquisition.
Plaintiffs allege that Chatila omitted material information about SunEdison's failure to consummate its acquisition of Latin American Power, a company that owned projects in Chile and Peru. SunEdison agreed to buy Latin American Power for approximately $733 million, to be paid in installments. (Compl't ¶¶ 221-22.) According to plaintiffs, SunEdison never paid any installment, including the initial closing payment. (Compl't ¶ 359.) On October 6, 2015, the Wall Street Journal reported that the transaction would not be completed, and included conflicting explanations as to why from both SunEdison and Latin American Power.[7] (Compl't ¶ 346; Bartlett Dec. Ex. 29.)
In a conference call of October 7, 2015, an analyst questioned Chatila about whether *488 SunEdison had failed to make a payment that was required to close the deal. (Compl't ¶ 346.) Chatila stated in part that "we're really disappointed with the result. We're still committed to Latin America.... The seller there did not satisfy the conditions precedent, the closing of the share purchase agreement. So instead of trying to fix it, remedying it, we're saying that the agreement is terminated." (Compl't ¶ 346.) The Complaint asserts that this description of the Latin American Power transaction was materially misleading because it omitted SunEdison's failure to make payments to the seller that were required to complete the transaction. (Compl't ¶ 347.)
Although Chatila did not cite to SunEdison's payment obligations to Latin American Power, the Complaint does not plausibly allege that his statement omitted material information. It does not allege that Chatila's description of Latin American Power's failure to satisfy conditions precedent was false. (Compl't ¶ 346.) Moreover, the Complaint does not plausibly allege that discussion of SunEdison's alleged non-payment would have significantly altered the total mix of information available to a reasonable investor. ProShares, 728 F.3d at 102. The Wall Street Journal had already reported that SunEdison would not complete the acquisition of Latin American Power. (Bartlett Dec. Ex. 29.) That article reported that, according to Latin American Power, SunEdison had failed to make an upfront cash payment of approximately $400 million, whereas SunEdison asserted that the deal fell through because Latin American Power breached unspecified conditions. (Bartlett Dec. Ex. 29.) Thus, the two parties' conflicting explanations were already in the mix of public information by the time of the October 7 conference call.
The Court therefore concludes that the Complaint has failed to plausibly allege that Chatila materially omitted information concerning the acquisition of Latin American Power.
5. The Complaint Does Not Allege a Misstatement Directed to the Adequacy of the Company's Internal Controls.
In addition to the three SEC filings discussed in the context of plaintiffs' Securities Act claims, the Complaint asserts that Chatila and Wuebbels falsely certified the effectiveness of the Company's financial controls for financial reporting in Form 10-Qs filed for the second and third quarters of 2014 and the third quarter of 2015. Plaintiffs' section 10(b) claim directed to the certification of internal controls is dismissed for the same reason that the Securities Act claim is dismissed. As discussed, despite allegations that describe inefficiencies and weaknesses in the Company's internal controls, the Complaint fails to identify any example of erroneous financial reporting on the part of SunEdison. Because there was no example of financial reporting that was alleged to be false or inaccurate because of the Company's internal controls, or other tangible harm that resulted from the Company's internal controls over financial reporting, the Complaint fails to plausibly allege that the certifications misstated the effectiveness of the Company's internal controls.
The Court therefore concludes that the Complaint has failed to allege a claim under the Exchange Act based on the certifications of the effectiveness of internal controls.
6. The Complaint Does Not Allege an Actionable Omission as to the Defendants' Actions toward the YieldCos.
The Complaint describes steps that SunEdison allegedly took to coerce *489 the YieldCos into providing immediate financing to the Company. (Compl't ¶ 188-214.) The Complaint alleges that when SunEdison was unable to obtain financing for its repayment obligations under the Margin Loan, the Company's management sought a cash infusion from the YieldCos. (Compl't ¶¶ 188-90.) Management at the two YieldCos refused, and cited an inability to agree to the consideration that would be provided by SunEdison. (Compl't ¶ 191.)
Chatila then scheduled a special meeting of the YieldCos' boards for November 20, 2015. (Compl't ¶ 192.) At the meeting, members of the YieldCos' senior management were terminated and replaced, and the YieldCos' boards and conflicts committees were reorganized with "loyalists." (Compl't ¶¶ 192-95.) Board meetings of the YieldCos were then called, Wuebbels was appointed CEO of both YieldCos, and Global agreed to an immediate payment of $150 million to SunEdison for the purchase of projects in India. (Compl't ¶¶ 196, 199, 203, 206-08.) This payment was allegedly critical to SunEdison, and made the same afternoon as the default deadline on the margin call. (Compl't ¶ 208.)
Plaintiffs allege that Chatila and Wuebbels materially misrepresented and omitted the Company's motivations for selling the India properties and shuffling personnel at the YieldCos. First, in two announcements on November 23 and 24, 2015, SunEdison announced that it had pre-paid all but $5 million of the Margin Loan. (Compl't ¶ 210.) Second, on November 23, 2015, SunEdison described the YieldCos' management changes as a step to "drive organizational alignment," and did not mention the need to divert cash to SunEdison. (Compl't ¶ 211.) Third, in a November 24, 2015 press release, Chatila and Wuebbels touted Global's acquisition of the India projects, describing it as beneficial to both Global and SunEdison. (Compl't ¶ 212.) The Complaint asserts that these statements omitted material information as to the motives behind SunEdison's actions, specifically as to SunEdison's need "to loot Global" for immediate cash in order to cover obligations on the Margin Loan. (Compl't ¶¶ 210-12.)
The Complaint has not identified statements that were rendered false or misleading by the reorganization of the YieldCo boards and the authorizing of the $231 million payment. The public statements accurately stated that SunEdison had substantially pre-paid the amounts owed on the Margin Loan, described changes in personnel and announced the sale of SunEdison's projects in India. (Bartlett Dec. Exs. 14, 15.) The statements contained broad, vague descriptions about the effects of these changes, stating, for example, they would help SunEdison "implement its plans to improve the alignment and effectiveness of its operating structure, drive operational efficiency and focus on its organic development opportunities." (Bartlett Dec. Ex. 14.) This generalized explanation did not offer concrete information, and amounts to puffery. See, e.g., San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies, Inc., 75 F.3d 801, 811 (2d Cir. 1996).
On April 4, 2016, published reports described a lawsuit that Global brought in Delaware Chancery Court against SunEdison, Chatila, Wuebbels and the Company's general counsel. (Compl't ¶ 251.) Global brought claims alleging breach of fiduciary duty, breach of contract and unjust enrichment. (Compl't ¶¶ 251-52.) Among other things, Global asserted that the defendants misrepresented SunEdison's liquidity to Global's board of directors and conflicts committee. (Compl't ¶¶ 251-52.) Accepted as true, Chatila and Wuebbels may have acted against the best interests of Global, *490 but such conduct does not show a material misstatement or omission to shareholders under the securities laws. See, e.g., In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig., 859 F.Supp.2d 572, 579 (S.D.N.Y. 2012) ("the securities laws do not impose a general duty to disclose corporate mismanagement ....") (Marrero, J.); cf. United States v. Matthews, 787 F.2d 38, 49 (2d Cir. 1986) (the securities laws do not require disclosure of uncharged criminal conduct).
The Court therefore concludes that the Complaint has failed to allege an actionable omission related to the Company's conduct toward the YieldCos.
C. The Complaint Fails to Allege Scienter.
1. The PSLRA's Scienter Requirement.
Separate from the requirement to identify a materially false statement or omission, a plaintiff also must raise a cogent and compelling inference of scienter. Scienter is " 'a mental state embracing intent to deceive, manipulate, or defraud.' " Capital Mgmt. Select Fund Ltd. v. Bennett, 680 F.3d 214, 225 (2d Cir. 2012) (quoting Tellabs, 551 U.S. at 319, 127 S.Ct. 2499 ). To successfully allege scienter, the Complaint must include "with particularity facts that give rise to 'a strong inference' that [defendants] acted consciously and recklessly in omitting or misrepresenting financial information." Indiana Pub. Ret. Sys., 818 F.3d at 93.
"[T]he scienter requirement is met where the complaint alleges facts showing either: 1) a 'motive and opportunity to commit the fraud'; or 2) 'strong circumstantial evidence of conscious misbehavior or recklessness.' " Emp. Ret. Sys. of Gov't of the Virgin Islands, 794 F.3d at 306 (quoting ATSI, 493 F.3d at 99 ). "[M]otive for scienter can 'be shown by pointing to the concrete benefits that could be realized from one or more of the allegedly misleading statements or nondisclosures; opportunity could be shown by alleging the means used and the likely prospect of achieving concrete benefits by the means alleged.' " Id. at 309 (quoting S. Cherry St., 573 F.3d 98, 108 ).
"Alternatively, if Plaintiffs cannot make the 'motive' showing, then they could raise a strong inference of scienter under the 'strong circumstantial evidence' prong, 'though the strength of the circumstantial allegations must be correspondingly greater' if there is no motive." ECA, 553 F.3d at 198-99 (quoting Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001) ). Circumstantial evidence of conscious misbehavior or recklessness "can support an inference of scienter in a variety of ways, including where defendants '(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor.' " Emp. Ret. Sys. of Gov't of the Virgin Islands, 794 F.3d at 306 (quoting ECA, 553 F.3d at 199 ).
"In the securities fraud context, we have typically found it sufficient to state a claim based on recklessness if the complaint 'specifically allege[s] defendants' knowledge of facts or access to information contradicting their public statements.' " Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 177 (2d Cir. 2015) (quoting Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000) ). An omission may be reckless if a complaint can allege "at least a reckless disregard of a known or obvious duty to disclose ...." Indiana Pub. Ret. Sys., 818 F.3d at 96. "In the securities fraud context, recklessness must be conduct that is highly unreasonable, *491 representing an extreme departure from the standards of ordinary care, not merely a heightened form of negligence." In re Advanced Battery Techs., Inc., 781 F.3d 638, 644 (2d Cir. 2015) (quotation marks and internal citations omitted); see also In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 76 (2d Cir. 2001) ("To qualify as reckless conduct, defendants' conduct must have been 'highly unreasonable' and 'an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.' ") (quoting Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 47 (2d Cir. 1978) ). A plaintiff "must show 'conscious recklessness-i.e., a state of mind approximating actual intent, and not merely a heightened form of negligence.' " Stratte-McClure, 776 F.3d at 106 (quoting S. Cherry St., 573 F.3d at 109 ) ).
The scienter requirements for a reckless omission vary from those for a reckless misstatement of affirmative fact. While an affirmative misstatement considers the speaker's knowledge of contradictory information, "conversely, where liability is premised upon alleged material omissions, if the complaint 'does not present facts indicating a clear duty to disclose'-such as that arising from the need to correct or update prior statements-'plaintiff's scienter allegations do not provide strong evidence of conscious misbehavior or recklessness.' " In re Centerline Holding Co. Sec. Litig., 380 Fed.Appx. 91, 93 (2d Cir. 2010) (summary order) (quoting Kalnit, 264 F.3d at 144 ); accord Indiana Pub. Ret. Sys., 818 F.3d at 96 (an omission may be reckless if a complaint can allege "at least a reckless disregard of a known or obvious duty to disclose ...."). Kalnit, for example, concluded that when a duty to disclose merger negotiations was "not so clear," the "plaintiff's scienter allegations do not provide strong evidence of conscious misbehavior or recklessness." 264 F.3d at 144.
On a motion to dismiss, a court must consider "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Tellabs, 551 U.S. at 322-23, 127 S.Ct. 2499 (emphasis in original). "[T]he inference of scienter must be more than merely 'reasonable' or 'permissible'-it must be cogent and compelling, thus strong in light of other explanations." Id. at 324, 127 S.Ct. 2499. "[T]he court must take into account plausible opposing inferences," including "nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." Id.
2. The Complaint Does Not Allege Motive and Opportunity to Commit Securities Fraud.
Plaintiffs do not allege that Chatila or Wuebbels had the motive and opportunity to commit fraud. The Complaint makes no allegation that they " 'benefitted in some concrete and personal way from the purported fraud.' " ECA, 553 F.3d at 198 (quoting Novak, 216 F.3d at 307-08 ). "Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry." Id. Generally, a plaintiff makes a showing of motive "when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit." Id.
The Complaint does not allege that Chatila and Wuebbels personally benefited from artificial inflation of the price of SunEdison stock. Indeed, during the *492 relevant period, both Chatila and Wuebbels submitted Form 4 filings to the SEC, in which they reported that they were increasing their holdings of SunEdison common stock. (Bartlett Dec. Exs. 18-19.) This included purchases made in August and September 2015, the time period when the Company was allegedly reckoning with liquidity shortfalls and the effects of the margin call. (Id. ) "[T]he purchase of additional company shares during the class period ... is inconsistent with an intent to commit fraud." In re Regeneron Pharm., Inc. Sec. Litig., 2005 WL 225288, at *22 (S.D.N.Y. Feb. 1, 2005) (Sweet, J.) (collecting cases).
The Court therefore concludes that the Complaint fails to allege that Chatila or Wuebbels had the motive or opportunity to commit fraud.
3. The Complaint Does Not Allege Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness.
With no allegations that Chatila and Wuebbels had the motive and opportunity to commit fraud, plaintiffs urge that there is strong circumstantial evidence giving rise to the inference that Chatila and Wuebbels knew of, or had conscious disregard for, the falsity of their statements. (Ex. Def. Opp. Mem. at 29-36.) Although the Court separately addresses scienter for each subject alleged to have been misstated or omitted, it does so in light of whether all of the facts alleged, taken collectively, support a strong inference of scienter. Tellabs, 551 U.S. at 322-23, 127 S.Ct. 2499.
a. The Complaint Does Not Allege Scienter as to the Strength of the Company's Liquidity Position.
This Court has concluded that the Complaint has not alleged an actionable misstatement or omission as to the Company's liquidity. Even if it had, the Complaint does not allege facts that support a cogent and compelling inference of scienter.
As discussed, the Company's descriptions of liquidity in the MD & A sections of its SEC filings were qualified and forward-looking. They were accompanied by cautionary language as to SunEdison's liquidity needs and the consequences if financing became unavailable, or was available only on unfavorable terms. Even if, as plaintiffs urge, the statements were tinged with more optimism than was warranted, these characterizations did not amount to a "an extreme departure from the standards of ordinary care." In re Advanced Battery Tech., 781 F.3d at 644.
The Court also has concluded that the plaintiffs have not alleged a material misstatement based on the Company's inclusion of the credit warehouse facility in its overall liquidity calculations. Even if they had, the Complaint would still fail to raise a cogent and compelling inference of scienter. The use of the credit warehouse facility as contributing to Company liquidity and capital resources was repeatedly disclosed to investors. Given that the funds from the credit warehouse facility were, in fact, accessible to SunEdison-albeit for projects that satisfied certain contractual criteria-the Complaint has failed to allege that their inclusion in the Company's liquidity calculation reflected "an extreme departure from the standards of ordinary care." Id.
The Court therefore concludes that plaintiffs have not raised a cogent and compelling inference of scienter as to Chatila and Wuebbels based on the Company's statements about its liquidity.
b. The Complaint Fails to Allege Scienter as to SunEdison's Debt Classification.
The Court has concluded that, for purposes of the Securities Act, the Complaint *493 has plausibly alleged that SunEdison materially misstated whether direct recourse against the Company was available to certain creditors. For the purposes of plaintiffs' claims against Chatila and Wuebbels under section 10(b) and Rule 10b-5, however, the Court concludes that the Complaint has not raised a cogent and compelling inference of scienter.
As previously discussed, the Company's statements about the recourse available to SunEdison's lenders were, taken together, contradictory and unclear, so that a reasonable investor reviewing the Form 10-Q for the second quarter of 2015 could have been left with the misimpression that certain debts were non-recourse. The narrative descriptions in SunEdison's Form 10-Q explained that direct recourse was available as to the Margin Loan and the Exchangeable Notes, while elsewhere in the same filing, these debts were listed as non-recourse. (Compl't ¶ 467; Bartlett Dec. Ex. 9 at 22-23, Ex. 10 at 25.) In the 10-Q for the third quarter of 2015, the debt classifications were revised to accurately state that they were recourse debt. (Compl't ¶ 167.) The classification was further muddied when, in November 2015, Chatila stated that the margin call required SunEdison to reclassify the loan from non-recourse to recourse, and stated that any prior classification of the Exchangeable Notes as non-recourse "was due to clerical error." (Compl't ¶ 369.) A UBS analyst observed in August 2015 that, "More broadly, we see characterization of debt between recourse and non-recourse in recent disclosures as potentially reducing mgmt. credibility." (Compl't ¶ 124.)
Although the Company's descriptions of creditor recourse were sloppy, contradictory and poorly drafted, they are not consistent with the "reckless disregard for the truth" required to allege scienter. S.E.C. v. Obus, 693 F.3d 276, 286 (2d Cir. 2012). The Company prominently and accurately described SunEdison's obligations to its creditors, which is inconsistent with a reckless disregard for the truth. Weighing the statements in their full context, including subsequent corrections, the more plausible inference is that the Company negligently erred in listing these debts as non-recourse against SunEdison, and subsequently attempted to resolve any confusion. See Tellabs, 551 U.S. at 324, 127 S.Ct. 2499. While defendants may have left a reasonable investor with unclear information about the debts' proper classifications, sloppy draftsmanship is not scienter, and "[n]egligence is not a sufficiently culpable state of mind to support a section 10(b) civil violation." Obus, 693 F.3d at 286 ; see also In re Advanced Battery Tech., 781 F.3d at 644 (scienter is "not merely a heightened form of negligence.")
The Court therefore concludes that plaintiffs have not raised a cogent and compelling inference of scienter as to Chatila and Wuebbels based on the Company's debt classifications.
c. The Complaint Does Not Plausibly Allege Scienter as to the Effectiveness of the Company's Internal Controls.
The Court has concluded that the Complaint fails to allege that Chatila and Wuebbels materially misstated the effectiveness of the Company's internal controls. Even if it had, the Complaint does not allege facts that support a cogent and compelling inference of scienter.
The Company publicly disclosed in the Form 10-K for 2014 that its acquisitions raised the "risk[ ]" of "difficulty in maintaining controls, procedures, and policies during the transition and integration ...." (Bartlett Dec. Ex. 2 at 28.) Such a disclosure is inconsistent with recklessly misstating facts known to the speaker. Moreover, *494 assuming that the internal controls were as dysfunctional as plaintiffs allege, the Complaint does not include facts that raise a cogent and compelling inference that Chatila and Wuebbels were reckless, as opposed to negligent, in stating that the Company had effective internal controls. The Complaint has described inefficient and cumbersome controls based on the Company's failure to integrate different accounting platforms and the frustrations that this caused for internal auditors (Compl't ¶¶ 70-77), but absent knowledge on the part of Chatila and Wuebbels that these systems resulted in misreported financial data, allowed for fraudulent conduct or facilitated other similar harms, plaintiffs fail to raise a cogent and compelling inference of scienter. Similarly, the Complaint explains the risks of using an unsecured Excel spreadsheet to consolidate financial data (Compl't ¶¶ 78-80), but it does not allege that any of these potential harms came to fruition, much less that they were known to Chatila and Wuebbels.
By contrast, Judge Kaplan concluded in Dobina that the Complaint adequately alleged that a certification of internal controls was made with a reckless disregard for its truth when the defendant was personally told about specific deficiencies in controls, including audit delays, and the company's inadequate controls eventually required the restatement of financial results. 909 F.Supp.2d at 246-47. Judge Koeltl concluded that a complaint plausibly alleged recklessness when defendants certified the efficacy of financial controls, despite having been sent an internal report which stated that "corporate management is a black hole and that the company lacks controls to approve their accounts." In re Eletrobras, 245 F.Supp.3d at 468. The Complaint in this case includes no comparable allegations of red flags that were brought to the attention of Chatila and Wuebbels.
The Court therefore concludes that while the Complaint has described sub-optimal internal controls, it fails to allege that the certifications made by Chatila and Wuebbels reflected a "reckless disregard for the truth" based on "an extreme departure from the standards of ordinary care." Obus, 693 F.3d at 286. Taking into account plausible opposing inferences, the Complaint at most alleges negligence, and not recklessness. Tellabs, 551 U.S. at 324, 127 S.Ct. 2499. The Complaint therefore fails to raise a strong inference of scienter as to the certification of the Company's internal controls.
d. The Complaint Fails to Allege Scienter as to the Margin Call and the Second-Lien Loan.
The Court has concluded that the Offering Documents in support of the Preferred Offering omitted material information as to the margin call and the terms of the Second-Lien Loan taken by SunEdison. As a result, plaintiffs have plausibly alleged a material omission under the Securities Act. For purposes of plaintiffs' claim under section 10(b) and Rule 10b-5, however, the Court concludes that plaintiffs have failed to allege facts that raise a cogent and compelling inference of scienter as to these omissions.
To adequately allege scienter for an omission, the Complaint must include facts showing "at least a reckless disregard of a known or obvious duty to disclose ...." Indiana Pub. Ret. Sys., 818 F.3d at 96. In opposition to defendants' motion, plaintiffs emphasize that Chatila and Wuebbels necessarily had knowledge of the margin call and the terms of the Second-Lien Loan. (Ex. Def. Opp. Mem. at 31-32.) That argument misses the mark. Defendants' knowledge about a given fact is relevant to the scienter of an affirmative misstatement, but not as to an omission. Plaintiffs have *495 not identified "a known or obvious duty to disclose" the existence of the margin call or the terms of the Second-Lien Loan. Indiana Pub. Ret. Sys., 818 F.3d at 96 (emphasis added); see also In re Sanofi Sec. Litig., 87 F.Supp.3d 510, 534 (S.D.N.Y. 2015) ("[t]he mere allegation that defendants failed to disclose [relevant information] does not in and of itself constitute strong evidence that they did so with scienter.") (Engelmayer, J.) (quotation marks omitted), aff'd sub nom. Tongue v. Sanofi, 816 F.3d 199 (2d Cir. 2016).
Along with failing to identify a known or obvious duty to disclose, the Company's public descriptions of the margin call weigh against an inference of scienter. On August 25, 2015, SunEdison acknowledged that there had been a margin call. (Compl't ¶ 124.) In a conference call of October 7, 2015, Wuebbels stated that the Company had placed $152 million in escrow to satisfy the margin call. (Compl't ¶ 141.) Then, in the 10-Q for the third quarter of 2015, which was filed on November 9, 2015, SunEdison stated that it deposited an additional $91 million in cash collateral for the margin loan. (Compl't ¶ 166.) This Form 10-Q also disclosed that the Company had entered into the Second-Lien Loan from Goldman Sachs, with a 9.25% interest rate and a $9 million origination fee. (Compl't ¶ 164.) "[S]cienter should not be found where defendants merely 'should have anticipated future events and made certain disclosures earlier than they actually did.' " Stratte-McClure, 776 F.3d at 107 (quoting Novak, 216 F.3d at 308-09 ). The Company's ongoing disclosures of its obligations under the margin call "do not provide strong evidence of conscious misbehavior or recklessness." Kalnit, 264 F.3d at 144 (emphasis in original); see also In re Scholastic, 252 F.3d at 76 (recklessness is shown through "highly unreasonable" conduct and "an extreme departure from the standards of ordinary care ...."). Interim disclosures are inconsistent with an intentional or reckless omission. See, e.g., Rombach, 355 F.3d at 176 ("Further, the allegation that defendants behaved recklessly is weakened by their disclosure of certain financial problems prior to the deadline to file its financial statements.").
The Complaint similarly fails to allege that Chatila and Wuebbels were reckless in failing to disclose the Second-Lien Loan. It does not allege a known or obvious duty to disclose the terms of the loan. Indiana Pub. Ret. Sys., 818 F.3d at 96. Plaintiffs again rely on the fairly obvious proposition that Chatila and Wuebbels knew about the Second-Lien Loan and its terms (Ex. Pl. Opp. Mem. at 31), an issue that does not go toward proving that an omission was recklessly made. In addition, the Company's disclosures concerning the Second-Lien Loan are inconsistent with an intentional or reckless omission. The terms of the Second-Lien Loan were set forth in the Company's 10-Q for the third quarter of 2015, and debt on the loan was reflected in a slide deck that the Company used in connection with a conference call of October 7, 2015.
The Court therefore concludes that, although the Complaint has alleged that the omissions of the margin call and the existence of the Second-Lien Loan were material, and thus sufficient to support plaintiffs' Securities Act claims, the Complaint also has failed to come forward with facts that raise a cogent and compelling inference of scienter. Plaintiffs' claim under section 10(b) and Rule 10b-5 directed to these omissions is therefore dismissed.
e. The Complaint Fails to Allege Scienter as to the Latin American Power Acquisition.
The Court has concluded that the Complaint has failed to allege an actionable *496 misstatement or omission by Chatila as to the Company's failed attempt to acquire Latin American Power. The claim is alternatively dismissed because the Complaint fails to raise a cogent and compelling inference of scienter.
The Complaint merely has described the conflicting explanations of two parties to a failed transaction, in which each side alleged that the other failed to carry out its obligations. Most importantly, the failure to consummate the transaction was publicly disclosed. Both SunEdison and Latin American Power offered their conflicting explanations in a Wall Street Journal article, which is cited in the Complaint. (Bartlett Dec. Ex. 29.) In the Form 10-Q for the third quarter of 2015, the Company stated that Latin American Power's sellers terminated the transaction, that SunEdison thereafter invoked a right to terminate based on the sellers' purported failure to satisfy a condition precedent, and that the sellers had submitted a demand for arbitration. (Compl't ¶ 358.)
Plaintiffs have not identified a clear duty to disclose Latin American Power's version of events, which was already widely known to the market. Plaintiffs also do not contend that Latin American Power had, in fact, satisfied all conditions precedent, thereby making Chatila's comment false. The Complaint therefore fails to allege highly unreasonable conduct and an extreme departure from the standards of ordinary care. In re Scholastic, 252 F.3d at 76.
The Court concludes that the Complaint fails to raise a cogent and compelling inference of scienter as to Chatila's description of the Latin American Power transaction.
f. The Complaint Fails to Allege Scienter as to Any Item 303 Omission.
The Court has concluded that the Complaint fails to allege a violation of Item 303 based on defendants' failure to separately identify liquidity trends likely to affect the Company. The claim is alternatively dismissed because the Complaint fails to raise a cogent and compelling inference of scienter.
To plead scienter, "[p]laintiffs must allege that Defendants were at least consciously reckless regarding whether their failure to provide adequate Item 303 disclosures ... would mislead investors about material facts." Stratte-McClure, 776 F.3d at 106. As discussed, while not labeled under an Item 303 heading, the Company's SEC filings explained to investors its present and ongoing need for liquidity. For example, the Form 10-Q for the third quarter of 2015 included discussion under the heading, "Risks Related to Liquidity and Capital Resources. (Bartlett Dec. Ex. 12 at 85.) It noted that "recent market conditions," including lower share prices for TERP and Global common stock, had decreased capital available to the two YieldCos, and that SunEdison accordingly "plan[ned] to reduce the volume" of projects sold to TERP and Global. (Id. ) This development marked a shift in the DevCo/YieldCo model adopted by the Company. The Company proceeded to warn that because "equity interests" in SunEdison, TERP and Global were trading "significantly below" past levels, project financing was "less attractive," and, absent additional financing, the Company was at risk of breaching its debt covenants. (Id. )
Thus, the Company publicly warned investors that declining stock prices were restraining the DevCo from selling projects to the YieldCo, that it was struggling to obtain financing, and that it was at risk of breaching debt covenants. Such disclosures are inconsistent with a reckless decision to omit a known trend.
*497 The Court concludes that the Complaint fails to raise a cogent and compelling inference of scienter as to the omission of an Item 303 certification.
D. Plaintiffs' Section 20(a) Claim Is Dismissed.
Count Two of the Complaint alleges that Chatila and Wuebbels violated section 20(a) of the Exchange Act. (Compl't ¶¶ 413-23.) "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." ATSI, 493 F.3d at 108. "[A] determination of § 20(a) liability requires an individualized determination of a defendant's control of the primary violator as well as a defendant's particular culpability." Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998). A control person is jointly and severally liable for the misstatements of the controlled person. Id.
Defendants seek dismissal of the section 20(a) claim solely on the grounds that the Complaint fails to allege a primary violation under the Exchange Act. (Sec. Def. Mem. at 40.) However, the Court has concluded that the Complaint adequately alleges a primary violation on the part of Chatila, specifically as to the expected generation of cash by the Company.
The section 20(a) claim is nevertheless dismissed. The only actionable primary violation of the Exchange Act was alleged to have been made by Chatila. As the alleged primary violator of the sole surviving claim under section 10(b), Chatila cannot also be liable under section 20(a) as his own control person. See Kalnit v. Eichler, 85 F.Supp.2d 232, 246 (S.D.N.Y. 1999) (defendants alleged to be the sole primary violators "could not be control persons and section 20(a) does not apply.") (Scheindlin, J.); Honig v. Cardis Enterprises Int'l N.V., 2016 WL 6304695, at *11 (E.D.N.Y. Oct. 27, 2016) (dismissing section 20(a) claim when the alleged facts described defendants as "primary violators liable under Section 10(a) rather than control persons liable under Section 20(a).") (Feuerstein, J.); Emp. Ret. Sys. of the Gov't of the Virgin Islands v. J.P. Morgan Chase & Co., 804 F.Supp.2d 141, 158 (S.D.N.Y. 2011) (noting that, "if proven," primary liability of individual defendants "will be found incompatible with [their own] control person liability ....") (Koeltl, J.).
The section 20(a) claim is also dismissed against defendant Wuebbels. Wuebbels was not alleged to have been the primary violator in Chatila's alleged misrepresentation about the date when the Company was expected to generate cash. "[A] determination of § 20(a) liability requires an individualized determination of a defendant's control of the primary violator as well as a defendant's particular culpability." Boguslavsky, 159 F.3d at 720. Wuebbels was Executive Vice President, Chief Administrative Officer and Chief Financial Officer during the period of the alleged primary violation by Chatila, who was CEO and a member of SunEdison's board. (Compl't ¶¶ 21-22.) While the Complaint alleges that both Chatila and Wuebbels were control persons of SunEdison, there is no allegation that Wuebbels was a control person of Chatila. Indeed, it would have been an implausible allegation had it been made. Wuebbels is not alleged to have been a board member of SunEdison. (Compl't ¶¶ 22, 419.) There are no facts alleged to support the conclusion that Wuebbels, "a senior manager of the Company," (Compl't ¶ 419) controlled Chatila, "the senior manager of the Company." (Compl't ¶ 418.)
*498 Plaintiffs' section 20(a) claim is therefore dismissed as to Chatila and Wuebbels.
III. THE COMPLAINT'S SECTION 11 CLAIM AGAINST KPMG IS DISMISSED.
A. Overview of Allegations against KPMG.
The Complaint asserts that KPMG violated section 11 of the Securities Act when it asserted that it complied with the Generally Accepting Auditing Standards ("GAAS") of the Public Company Accounting Oversight Board ("PCAOB") in its review of the Company's internal controls over financial reporting. For the reasons that will be explained, the claim against KPMG is dismissed.
"[A]n accountant has responsibility under Section 11 for the accuracy of the financial statements she certifies." In re WorldCom, Inc. Sec. Litig., 352 F.Supp.2d 472, 492 (S.D.N.Y. 2005) (Cote, J.). "Unlike other Section 11 defendants, who are liable for any and all material misstatements or omissions within a registration statement, an accountant may be liable only for those statements 'which purport[ ] to have been prepared or certified by him.' " Id. at 491 (quoting 15 U.S.C. § 77k(a)(4) ).
KPMG was SunEdison's outside auditor. (Compl't ¶¶ 77, 450.) In its work as auditor, KPMG signed a "Report of Independent Registered Public Accounting Firm" (the "Audit Report") that was attached to SunEdison's Form 10-K for 2014. (Compl't ¶¶ 427, 450.) As has been discussed, the Offering Documents incorporated this Form 10-K by reference, including the Audit Report. (Compl't ¶ 427.)
KPMG's alleged misstatements are limited to a portion of the Audit Report in which KPMG stated that it had complied with GAAS, as promulgated by the PCAOB. (Compl't ¶ 488.) The Complaint quotes the Audit Report at length. (Compl't ¶ 488.) In the Audit Report, KPMG stated, "We have conducted our audits in accordance with the standards of the [PCAOB]," and "perform[ed] the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects." (Compl't ¶ 488.) KPMG explained that it had audited consolidated financial statements for evidence supporting the amounts and disclosures contained therein. (Compl't ¶ 488.) It stated that its review of SunEdison's internal controls was "designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with [GAAP]." (Compl't ¶ 488.) KPMG concluded that for the purposes of the Form 10-K for 2014, the Company maintained effective internal controls for the purposes of its financial reporting. (Compl't ¶ 488.)
The Complaint asserts KPMG materially misrepresented the effectiveness of the Company's internal controls. (Compl't ¶ 489.) Plaintiffs allege that KPMG violated the GAAS by ignoring severe deficiencies in the Company's internal controls at the time of the audit, specifically including GAAS Standard No. 3, which requires an auditor to exercise due professional care in performing an audit, and GAAS Standards of Fieldwork Nos. 2 and 3, which require an independent auditor to obtain information sufficient to afford a reasonable opinion. (Compl't ¶ 489-92, 499.) The Complaint alleges that a GAAS-compliant audit would have revealed deficiencies in the Company's internal controls, specifically including the non-integrated systems used across SunEdison's divisions and use of *499 the unsecured Excel spreadsheet. (Compl't ¶ 497.)
The Court concludes that the Complaint fails to plausibly allege a section 11 claim against KPMG. First, as has been discussed, the Complaint's failure to identify any misrepresentation of financial data contained in the Form 10-K for 2014 is fatal to plaintiffs' claim. Second, the Complaint fails to include facts to support a conclusion that KPMG did not honestly hold its belief that it complied with GAAS. Courts have noted the breadth and subjectivity of GAAS obligations. Because the Complaint includes no supporting facts to show that KPMG did not honestly satisfy its duty of care under GAAS, the section 11 claim against it is dismissed.
B. The Complaint Fails to Identify Any Misstated Financial Reporting Information in the Form 10-K for 2014.
The section 11 claim against KPMG is directed to the Company's internal controls over financial reporting. But, as has been discussed at length, the Complaint identifies no misrepresentation or inaccuracy in the financial reporting data recited in the Form 10-K for 2014. GAAS General Standard No. 3 requires "an audit of internal control over financial reporting," and no misstatements in the Company's financial reporting have been identified.[8]
In support of the claim against KPMG, the Complaint cites to the Company's public statements in April 2016 that acknowledged deficiencies in internal controls. But the weaknesses identified in 2016 did not touch on financial reporting. Instead, the Company cited to its cash forecasting processes, management's need to more fully discuss risks and adjustments with the Company's board, management's inadequate response to missed cash forecasts, and management's disclosures to the Company board concerning cash flow, including extensions of accounts payable and use of cash committed for projects. (Compl't ¶ 498.) These statements about deficient internal controls related to internal management of cash, and not to public financial reporting.
Even if they did relate to the narrower issue of financial reporting, the Company's statements of April 2016 pertained to the contents of the Form 10-K for fiscal year 2015. This acknowledgement of deficiencies would not apply to the internal controls over financial reporting for the 10-K covering fiscal year 2014.
Because the Complaint has failed to identify an error in the Company's financial reporting in the relevant 10-K, the section 11 claim against KPMG is dismissed. See, e.g., In re Braskem, 246 F.Supp.3d at 758 ; In re Lehman Bros., 799 F.Supp.2d at 300 ("Section 11's purposes include holding auditors and others strictly liable, subject to the due diligence defense, for materially false or misleading statements in the portions of registration statements 'expertised' by them.").
C. The Complaint Does Not Plausibly Allege that KPMG Did Not Honestly Believe that It Complied with Its Duties Under GAAS.
The section 11 claim against KPMG is also dismissed for the separate reason that the Complaint fails to allege that KPMG did not honestly hold its stated opinions about the sufficiency of its audit of internal controls over financial reporting.
The Complaint broadly alleges that KPMG failed to comply with GAAS, as set forth at AU § 150.02, which states: "The auditor must exercise due professional *500 care in the performance of the audit and the preparation of the report."[9] As Judge Kaplan has noted, GAAS implements standards that "are couched in rather general and in some cases inherently subjective terms. They require, for example, that the auditor plan the audit engagement properly, use 'due professional care,' exercise 'professional skepticism,' and 'assess the risk of material misstatement due to fraud'-all matters as to which reasonable professionals planning or conducting an audit reasonably and frequently could disagree." In re Lehman Bros., 799 F.Supp.2d at 300. Given the breadth of such opinions, "more is necessary to make out a claim that the statement of opinion was false than a quarrel with whether these standards have been satisfied." Id. at 300-01.
For the purpose of evaluating an opinion-based claim under section 11, Omnicare observed that "a sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless whether an investor can ultimately prove the belief wrong." 135 S.Ct. at 1327. "Reasonable investors understand that opinions sometimes rest on a weighing of competing facts; indeed, the presence of such facts is one reason why an issuer may frame a statement as an opinion, thus conveying uncertainty." Id. at 1329.
The Complaint fails to include facts to support an inference that KPMG did not honestly believe that it exercised the duty of due care as required by the GAAS at AU § 150.02. (Compl't ¶ 491-92.) It also does not include facts to support the assertion that KPMG failed to assess the risk of financial misstatements as required by GAAS AU § 150.02, or that KPMG had an insufficient basis to state its opinion about the financial statements as a whole based on its audit as required by Standard of Reporting 4 in the same GAAS provision. (Compl't ¶¶ 499-500.) Its allegations merely reverse-engineer the Company's disclosures of April 2016 and seek to apply them to unrelated statements contained in the Audit Report, which was filed more than a year earlier.
Because the Complaint does not plausibly allege that KPMG did not honestly hold the opinion that it complied with the broad obligations of GAAS, the Complaint's section 11 claim against KPMG is dismissed.
CONCLUSION.
For the reasons explained, the Court concludes that the Complaint has plausibly alleged violations of the Securities Act related to defendants' statements concerning the August 2015 margin call, the Second-Lien Loan and the availability of lender recourse against SunEdison. All other claims under the Securities Act are dismissed.
The Complaint fails to allege section 10(b) or Rule 10b-5 violations against Chatila and Wuebbels, with the exception of Chatila's statement published in September 2015 concerning the timing of SunEdison's cash generation. The motion to dismiss that claim is therefore denied as to Chatila under section 10(b) and Rule 10b-5. Plaintiffs' claims under the Exchange Act are otherwise dismissed.
KPMG's motion to dismiss is granted in its entirety. Plaintiffs' claim against KPMG is therefore dismissed.
The Clerk is directed to terminate the motions and the related letter-motion. (16 MD 2742, Docket # 200; 16 MC 2742, *501 Docket # 33, 35, 41, 46; 16 Civ. 7917, Docket # 142, 145, 147, 149.)
SO ORDERED.

The Director Defendants are Emmanuel Hernandez, Antonio R. Alvarez, Peter Blackmore, Clayton C. Daley, Jr., Georganne Proctor, Steven V. Tesoriere, James B. Williams and Randy H. Zwirn. (Compl't ¶¶ 431-38.)

The Underwriter Defendants are Goldman, Sachs & Co. ("Goldman Sachs"), Merrill Lynch, Pierce, Fenner & Smith Incorporate ("Merrill Lynch"), Deutsche Bank Securities Inc. ("Deutsche Bank"), Morgan Stanley & Co. LLC ("Morgan Stanley"), J.P. Morgan Securities LLC ("J.P. Morgan"), Macquarie Capital (USA) Inc. ("Macquarie") and MCS Capital Markets LLC ("MCS").

Shareholders of the two YieldCos brought separate class action complaints against TERP, Global and assorted individual defendants, including Chatila and Wuebbels. The Court has granted preliminary approval of a proposed class action settlement in the Global shareholder action. (16-md-2742, Docket # 269.) On January 31, 2018, the Court granted final approval of the class action settlement in the TERP shareholder action. (16-md-2742, Docket # 29.)

The lenders on this margin loan were Goldman Sachs Lending Partners LLC, Deutsche Bank AG, Barclays Bank plc, Morgan Stanley Bank, N.A. and Mall LLC. (Compl't ¶ 33.)

The Form 10-Q for the second quarter of 2015 used the term "Renewable Energy Credit Facility," as opposed to "Solar Energy credit facility." (Compl't ¶ 455.)

See https://www.sec.gov/corpfin/cf-manual/topic-9. Informal agency guidance is not entitled to the deference afforded to formal agency rulemaking under Chevron, U.S.A., Inc. v. NRDC, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), but is instead afforded deference according to its persuasiveness. See United States v. Mead Corp., 533 U.S. 218, 221, 228, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). The Court affords persuasive weight to the SEC's guidance for the limited purpose of providing context on use of the terms "liquidity" and "capital resources" in the Company's SEC filings. This weight is based on the agency's expertise, the longevity of its statements and registrants' need for clear guidance as to their filing obligations. Id. at 228, 121 S.Ct. 2164.

This article is cited in the Complaint (¶ 346) and therefore is incorporated by reference. It is properly considered as part of the motion to dismiss without converting the motion into one for summary judgment. ATSI, 493 F.3d at 98.

https://pcaobus.org/Standards/Auditing/Pages/Auditing_Standard_3.aspx

See https://www.aicpa.org/Research/Standards/AuditAttest/DownloadableDocuments/AU-00150.pdf
r reasonably likely future cash requirements.